[Civ. No. 20412. First Dist., Div. One. Mar. 28, 1963.]

T. O. McKEE, Plaintiff and Appellant, v. GEORGE PETER-
SON, Defendant and Respondent; MERRILL CLE-
MENTSON, Defendant and Appellant.

Connella, Sherburne & Myers and E. Conrad Connella for Plaintiff and Appellant.

Alexander S. McDill for Defendant and Appellant.

Koford, McLeod & Koford and George M. McLeod for Defendant and Respondent.

BRAY, P. J.—Plaintiff McKee appeals from the judgment herein in favor of defendant Peterson and awarding defendant Peterson costs against plaintiff. Defendant Clementson appeals from that portion of the judgment awarding plaintiff $4,975 against defendants Clementson, Butler, and Furst. Defendants Butler and Furst do not appeal.

## QUESTIONS PRESENTED

*Plaintiff's Appeal.*

1. Where a mortgagee relies upon documentary indicia of ownership of an automobile supplied by the seller, but without possession of the automobile, is the seller estopped to claim ownership against the mortgagee?[1]

2. May defendant Peterson retain profits of sale of the mortgaged automobile?

*Defendant Clementson's Appeal.*

Is the finding of corporate *alter ego* supported?

## RECORD

This controversy arose out of the sale to Hillsborough Motors, a corporation, a used car dealer in Millbrae, of a Cadillac by plaintiff, a wholesale used car dealer in Flint, Michigan. In accordance with their practice under a contract between Hillsborough and plaintiff, plaintiff on telephone order of Hillsborough sold the car to Hillsborough. Before the car left Michigan plaintiff sent the latter a bill of sale of the car made out to Hillsborough and a Michigan automobile certificate endorsed to Hillsborough. Hillsborough sent plaintiff a check in the agreed amount of $4,175. The check was inadvertently made payable to another dealer. On receipt plaintiff phoned Hillsborough asking for a check correctly made out. This check was sent. However, it was dishonored after deposit in bank. The next day after phoning Hillsborough, plaintiff started the car on its way to California. In the meantime pursuant to an agreement between Hillsborough and defendant Peterson that the latter would "floor" (finance) Hillsborough's cars, Peterson advanced plaintiff $3,655 on the Cadillac, receiving the title documents and a bill of sale from Hillsborough to Peterson. Peterson, in turn and before learning of the dishonored check, "floored" the car with the Morris Plan Company in Hayward, for an advance of $3,800. Morris Plan issued a "Trust Receipt" in reliance upon the documents sent out by plaintiff and the bill of sale, Hillsborough to Peterson.

Hillsborough was in financial trouble, so Clementson, president of Hillsborough, asked Peterson to take over the firm's

---

[1] The term "mortgagee" is used here because in *Pacific Finance Corp.* v. *Hendley* (1930) 103 Cal.App. 335, 337 [284 P. 736], a transfer similar to that herein discussed was held to constitute a mortgage. (See *Bonestell* v. *Western Automotive F. Corp.* (1924) 69 Cal.App. 719 [232 P. 734].)

management. Peterson did so in an attempt to salvage payment of part of the debt owed him by Hillsborough for cars "floored" by him. Peterson took possession of the Cadillac on its arrival. Plaintiff came to Millbrae, and there learned that Peterson had taken the car.

Plaintiff then brought this action in claim and delivery against Peterson. Peterson posted a repossession bond, retained the automobile and then sold it for $4,876, or a net after payment of fees and commissions of $4,450. He applied $3,655 to pay off his "flooring" of the car, and applied the balance of $795 towards the reduction of Hillsborough's general indebtedness to him.

Peterson answered plaintiff's complaint, contending that plaintiff was estopped as to him to claim possession of the car or damages for its alleged conversion. In the complaint defendants Clementson, Furst, and Butler were joined as defendants on the theory that the corporate defendant Hillsborough was their *alter ego*. The court, disregarding the corporate entity, gave plaintiff judgment for $4,975 against Hillsborough, Clementson, Furst, and Butler. It gave Peterson judgment and costs against plaintiff.

*Plaintiff's Appeal.*

1. *Was Plaintiff Estopped?*

■ To determine whether plaintiff seller is estopped to claim title as against the mortgagee under the circumstances of this case, it is first necessary to determine the effect of payment by worthless check. While there is a substantial amount of academic controversy on the question (see 2 Williston on Sales (rev. ed.) § 346a, pp. 343-345), the California case law appears settled. In the absence of other agreement, when property is sold to be paid for by check, the sale is treated as one for cash, and, as between the parties, title to the property remains in the seller. (*South S.F. Pkg. etc. Co. v. Jacobson* (1920) 183 Cal. 131, 135-136 [190 P. 628]; *Towey v. Esser* (1933) 133 Cal.App. 669 [24 P.2d 853]; see also *Western Specialty Co. v. Clairemont Construction Co.* (1962) 204 Cal.App.2d 532, 538 [22 Cal.Rptr. 536].)

Whether a seller who has entrusted indicia of ownership to a buyer paying for an automobile with a bad check is estopped from asserting his title as against a mortgagee in good faith of the buyer has not been determined in this state. It apparently has been determined that where the seller has entrusted to the buyer *both* the possession of the automobile and

indicia of ownership, the seller may be estopped to assert his title against a bona fide purchaser from the buyer. [2] 1 Witkin, Summary of California Law, page 546, points out that the minority view in other jurisdictions is that the buyer may transfer a good title to a bona fide purchaser, but that California follows the majority rule which is that title does not pass to a bona fide purchaser unless the facts raise an estoppel against the seller, and that the mere entrustment of possession to the buyer under a cash sale, without indicia of ownership or authority to sell, is not enough to deprive the seller of his title. (See authorities there cited.)

In *Meadows* v. *Hampton Live Stock Com. Co.* (1942) 55 Cal.App.2d 634 [131 P.2d 591], the seller received in payment of cattle, drafts which were dishonored. Delivery of the cattle was made to the buyer at a public stockyard, together with a brand inspection slip, although no bill of sale or other indicia of ownership was given. The seller, however, knew that the cattle would be offered for sale to others. It was held that, in effect, the seller had entrusted the buyer with indicia of ownership and was estopped from asserting title as against bona fide purchasers. The court said (p. 636) : ''The owner of property who clothes another with the apparent title to it, or the power of disposition of it, is estopped from afterwards asserting his title against an innocent third party who has thereby been induced to deal with the apparent owner in reference thereto.'' The court further stated that the purchasers were protected by the rule set forth in section 3543, Civil Code, ''Where one of two innocent persons must suffer by the act of a third, he, by whose negligence it happened, must be the sufferer.''

In *Keegan* v. *Kaufman Bros.* (1945) 68 Cal.App.2d 197 [156 P.2d 261], an action involving the sale of lambs paid for by checks which were dishonored, the court said that in *Meadows, supra,* section 3543 of the Civil Code '' 'has been applied to bona fide purchasers for value from those who have been clothed with the indicia of ownership. It has been held that although the true owner is guilty of no more than misplaced confidence, such misplaced confidence is negligence within the meaning of section 3543. (*Phelps* v. *American Mortgage Co.*, 40 Cal.App.2d 361, 366 [104 P.2d 880]; *Camerer* v. *California Sav. etc. Bank*, 4 Cal.2d 159, 172 [48 P.2d 239, 100 A.L.R. 667].)' '' (P. 203 of 68 Cal.App.2d.)

Vold in Law of Sales (2d ed.) pages 177-178, criticizes the use of section 3543, Civil Code, as applying to bad check cash

sales. However, he concludes (p. 178) that such sales may be analogized to the situation where negotiable instruments, factor's acts and market overt are involved, and that title should pass to the bona fide purchaser.

It would seem that section 1743, subdivision 1, Civil Code, similar to section 23 of the Uniform Sales Act, is more directly applicable to the worthless check situation: "Subject to the provisions of this act, where goods are sold by a person who is not the owner thereof, and who does not sell them under the authority or with the consent of the owner, the buyer acquires no better title to the goods than the seller had, *unless the owner of the goods is by his conduct precluded from denying the seller's authority to sell*." (Italics added.)

*Commercial Credit Co.* v. *Barney Motor Co.* (1938) 10 Cal. 2d 718 [76 P.2d 1181], discussed the "flooring" of automobiles for retail dealers as something that "has come into common practice" (p. 720) and stated (p. 721): "The title holder, having clothed the retail dealer with all the appearances of ownership or authority to sell, could not be heard to assert title or ownership as against a purchaser for value without actual notice of the reserved title who had been led by appearances created by the true owner to believe that the dealer had authority to dispose of the title in the usual course of trade. Under such cases the rights of the purchaser did not necessarily depend on the actual title or authority of the dealer, but were derived from the act of the real owner, which precluded him from disputing as against an innocent party, the existence of the title or power which, through negligence or mistaken confidence, he had caused or allowed to be vested in the party making the sale. (*Rapp* v. *Fred W. Hauger Motors Co.*, 77 Cal.App. 417, 422 [246 P. 1067], and cases cited *supra*.)"

There are a number of cases in this state holding that the owner of an automobile who has clothed a dealer with the indicia of ownership *and* the possession of the automobile, is estopped from asserting his title as against an innocent purchaser for value. As this rule is based upon the principles of estoppel, we can see no reason why the rule may not be applied under circumstances where the innocent buyer is misled to his detriment by the transfer to him of the indicia of ownership without the immediate delivery of possession of the automobile. However, our inquiry concerns not an innocent buyer but an innocent mortgagee, and the question of whether a bona fide mortgagee is entitled to the same protec-

tion as would be a bona fide purchaser. Prior to the enactment of the Uniform Sales Act in California, buyers were protected where there was an "executed sale" by section 1142, Civil Code, since repealed. It was held that the protection did not apply to a mortgagee. (*Pacific Finance Corp.* v. *Hendley,* *supra,* 103 Cal.App. 335; (1932) 119 Cal.App. 697 [7 P.2d 391].) However, that case is not determinative here for the reason that the court there based its decision solely on the construction of that statute and held that because the statute limited its application to an "*executed sale to a buyer*" a mortgagee was not intended to be included. Moreover, the court impliedly recognized that estoppel might be invoked in favor of a bona fide mortgagee but determined that under the facts of that case the burden of proving estoppel had not been met.

Since the repeal of section 1142 and the simultaneous adoption of the sales act there has been no case considering the situation of a mortgagee in the respect important here. With reference to the term "buyer" in Civil Code section 1743, subdivision 1, section 1796, subdivision 1, defines a "buyer" as a "person who buys or agrees to buy goods or any legal successor in interest of such person." In the same section it is stated: " 'Purchaser' includes mortgagee and pledgee." Section 1795 provides: "The provisions of this act relating to contracts to sell and to sales do not apply, unless so stated, to any transaction in the form of a contract to sell or a sale which is intended to operate by way of mortgage, pledge, charge, or other security." It thus might be argued, in the absence of any guiding authority, that a mortgagee does not come within the estoppel provisions of section 1743, subdivision 1. Witkin, interpreting the *Hendley* case somewhat differently, said, "It would seem therefore [in light of § 1743, subd. 1, and § 1796] that a mortgagee cannot rely upon mere apparent authority *to sell,* and is entitled to protection against the true owner only where the conduct of the owner was such as to estop him to deny the authority of the dealer or agent *to mortgage.*" (1 Witkin, Summary of California Law, Sales, § 62, p. 542; italics the author's.) However, as we have hereinbefore pointed out, *Hendley, supra,* does indicate that there may be facts which would entitle an estoppel to be asserted against the original seller.

No good reason is apparent, in light of the more or less interchangeable use of the terms "buyer" and "purchaser," to cause the restriction of the meaning of "buyer" to exclude

a mortgagee. To do so would seem hypertechnical. Moreover, there is an Iowa decision (*Crescent Chevrolet Co.* v. *Lewis* (1941) 230 Iowa 1074 [300 N.W. 260]) protecting a mortgagee, not citing the Uniform Sales Act section comparable to Civil Code section 1743, subdivision 1, but deciding the case on the same principle as enunciated in section 3543, which could properly be viewed as the principle underlying section 1743, subdivision 1. *Crescent*[2] presents a situation very similar to the one involved in the instant case, even though the invoice of the car was accompanied by delivery of the car. The plaintiff car dealer sold a car to the defendant car dealer. Payment was by check which was dishonored because of the death of the defendant who had mortgaged the car to an acceptance corporation immediately upon its being delivered to him, accompanied by an invoice. On estoppel principles the mortgagee prevailed over the unpaid seller since the plaintiff had clothed the buyer with indicia of ownership, the invoice, and because the plaintiff should have expected this sort of financing arrangement to take place, it being a common practice. The mortgagee was explicitly held to qualify as a bona fide purchaser. Although there the delivery of the car accompanied the invoice, the decision seems to be based more upon the fact of the delivery of the invoice to the defendant car dealer rather than that of delivery of the car. The court said that the principal circumstance relied upon by the mortgagee was the invoice delivered to the defendant dealer who used it in securing the flooring by the acceptance corporation. In holding that the doctrine that in the payment for an automobile with a bad check title does not pass, does not apply to a bona fide mortgagee, the court said (p. 262 [300 N.W.]) : "The more recent authorities usually base such holdings upon the doctrine that where the owner of personal property so clothes another with indicia of title as to deceive a bona fide purchaser relying thereon, the purchaser will be protected against the true owner. The rule does not depend upon actual title, but rests upon conduct of the party which precludes him from disputing, as against the innocent acting person, the existence of the title or power which, through negligence or mistaken confidence, he caused or allowed to appear to be

---

[2]The general subject is extensively annotated in note 18 A.L.R. 2d p. 830, § 6, and p. 848, § 11, indicating the prevailing rule to be that delivery of indicia of ownership such as motor vehicle certificates of title, bills of sale or invoices is sufficient to cause an estoppel. (See also 1 U.L.A., Sales, § 23.)

vested in the third party. *Gustafson* v. *Equitable Loan Assn.,* 186 Minn. 236 [243 N.W. 106]. This is but an application of the broad general principle that when one of two innocent persons must suffer by the act of a third person, he who put it in the power of the third person to inflict the injury must bear the loss.''

■ In the instant case, plaintiff testified that ''it is a common thing for dealers to floor plan automobiles'' and that he knew that some dealers would use title documents such as he sent Hillsborough in order to floor a car. ■ *Crestline Mobile Homes Mfg. Co.* v. *Pacific Finance Corp.* (1960) 54 Cal.2d 773 [8 Cal.Rptr. 448, 356 P.2d 192], sets forth the four required elements to apply the doctrine of equitable estoppel as follows (pp. 778-779) : '' (1) that the party to be estopped must be apprised of the facts; (2) he must intend that his conduct will be acted upon, or act in such a manner that the party asserting the estoppel could reasonably believe that he intended his conduct to be acted upon; (3) the party asserting the estoppel must be ignorant of the true state of the facts; and (4) he must rely upon the conduct to his injury. [Citations.] ■ Negligence that is careless and culpable conduct is, as a matter of law, equivalent to an intent to deceive and will satisfy the element of fraud necessary to an estoppel. [Citations.]'' There Crestline sold and delivered a trailer to one Peterson, a retail dealer, receiving his check therefor, the check to be held until Peterson should notify Crestline that he had sufficient funds in bank to pay the check. No such notice was ever given Crestline. Peterson issued to Pacific a trust receipt covering the trailer, for moneys loaned thereon. Peterson exhibited to Pacific the original invoice and shipping order executed by Crestline which indicated that Peterson had paid Crestline the purchase price by check. In small print on the invoice there was a statement that title remained in seller until entire purchase price was paid. The court applied section 3543, Civil Code, *supra,* and held Crestline estopped from asserting title against Pacific, the mortgagee of Peterson.

■ Although there is a distinction in the facts from those in our case, in that in addition to the indicia of ownership the seller gave possession of the property sold, we see no reason why the principles applied do not apply to our case, as all of the required elements of estoppel appear. Plaintiff knew that it was customary for the retail dealer to floor automobiles to a mortgagee relying on indicia of ownership from

the seller. He therefore must be held (and was so held by the trial court) to intend that his conduct would be acted upon or that a mortgagee could reasonably believe that he intended his conduct to be acted upon. Peterson was ignorant of the true state of facts, and relied upon plaintiff's conduct to his injury. A witness from Morris Plan testified that it was common practice in the automobile business to loan money on cars in transit, and before they reach California, on evidence of ownership in the dealer and that the cars are insured against "crack up" or being stolen en route. Plaintiff started the car to California the next day after he mailed the indicia of ownership.

In *Mercantile Acceptance Corp.* v. *Liles Bros. Motor Co.* (1959) 167 Cal.App.2d 779 [334 P.2d 983], there was a situation somewhat similar to that in this case. There Liles Bros. operated a wholesale used car lot in Memphis, Tennessee. They sold some 15 automobiles to Sacto Auto Wholesalers, Inc., which had a used car lot in Sacramento. In December 1955, Liles Bros. sold Sacto 10 automobiles. They were driven to Sacramento from Memphis. Liles Bros. sent certificates of title to a Sacramento bank with sight drafts attached, the certificates to be delivered upon payment of the drafts. The cars were delivered to Sacto without any demand from the drivers of payment therefor. The drafts were not paid. Five of these cars were sold by Sacto to individual buyers, who executed conditional sales contracts. These contracts were assigned to Mercantile who advanced moneys to Sacto thereon, although Mercantile did not receive any certificates of title at the time it discounted the contracts. The practice in the trade was to accept assignments of conditional sales contracts without examining evidence of title. Liles knew that Sacto purchased the automobiles for resale to the general public on its used car lot at Sacramento. The evidence showed that frequently the drafts and the accompanying papers were left in the bank for several weeks before being paid. In the meantime the cars would be sold to purchasers under conditional sales contracts which were purchased by Mercantile. In holding that Liles was estopped from asserting any title to the automobiles as against Mercantile the court said (p. 784): " 'It is a well settled law of this State that the owner of property who clothes another with the apparent title to it and the power of disposition thereof is estopped from afterward asserting his title against an innocent third party, who has thereby been induced to deal with the appar-

ent owner in reference to such property. (See: *Pacific Finance Corp.* v. *Hendley*, 103 Cal.App. 335 [284 P. 736]; 119 Cal.App. 697 [7 P.2d 391]. See also: *Meadows* v. *Hampton Livestock Com. Co.*, 55 Cal.App.2d 634, 636 [131 P.2d 591].)

" 'Section 3543 of the Civil Code provides: "Where one of two innocent persons must suffer by the act of a third, he, by whose negligence it happened, must be the sufferer." . . .' "

Factually this case is distinguishable from the one at bench in that the cars had been delivered to Sacto before Mercantile discounted the conditional sales contracts entered into by the purchasers, although, at that time, Sacto had no indicia of title, nor did Mercantile see any indicia of title. Liles' knowledge of the custom of flooring cars by the dealer and his delivery of the cars to a dealer whom he knew would sell or mortgage them is the principal factor upon which the estoppel was based. So in our case plaintiff's knowledge of the custom of the dealer in "flooring" cars before actual receipt of them but with indicia of ownership received from plaintiff, is a basis upon which estoppel must be predicated.

In *Siegel* v. *Bayless* (1952) 113 Cal.App.2d 661 [248 P.2d 968], the Michigan owner of an automobile entrusted its sale to a factor in California. The factor absconded with the purchase price. In holding that the purchaser's title prevailed over that of the original owner, the court stated that as the automobile had never been registered in California the provisions of the Vehicle Code concerning transfer of a registered vehicle did not apply. Nor for the same reason do they in the instant case.

In spite of the fact that Peterson maintained an office on the Hillsborough premises, discussed the business with its officers, and had the right of access to Hillsborough records and a key to the office, there is no evidence that he had actual knowledge that any check given plaintiff by Hillsborough would be dishonored, or that there were any circumstances which would not justify him, knowing that the automobile was in transit to Hillsborough, in relying upon the indicia of ownership sent out by plaintiff. There are no circumstances here putting Peterson on notice requiring him to investigate such as there were in *Henderson* v. *General Acceptance Corp.* (1930) 209 Cal. 268 [286 P. 1014], where the defendant knew of the "unsatisfactory business conduct" (p. 270) of the assignor of the automobile, "expressed concern as to the title to the car and made an effort to trace the title by inquiry at

Sacramento as to its registration. Finding no trace of the title there the defendant made no further independent inquiry. The facts were abundant to arouse the suspicions of the defendant as to Hunter's title and to put the defendant upon further inquiry as to the title, information as to which was readily available at the place of business of the distributor of the car in San Francisco.'' (P. 270.)

After taking possession of the car, Peterson sold it. Plaintiff contends that in so doing he was acting as agent for Hillsborough, and hence its guilt is imputed to him. Assuming, without deciding,[3] that he was so acting at that time, his right to the car arose at a time when he was not Hillsborough's agent. His right thereto is completely independent of any rights of Hillsborough; it is derived from plaintiff's acts which created the estoppel situation (*Siskin* v. *Dembroff* (1932) 121 Cal.App. 730, 744 [9 P.2d 908]) and relates to the time the estoppel arose.

Plaintiff contends that defendant Peterson is not entitled to assert estoppel because he has not met the burden of proving that he comes into court with clean hands,[4] for the reasons: (1) that Peterson knew or should have known of the precarious financial condition of Hillsborough at the time he advanced money on the Cadillac; (2) that thereafter he accorded himself preferences over Hillsborough creditors by his seizure of Hillsborough's inventory and liquidation thereof; (3) that Peterson engaged in usurious practices.

1. Plaintiff points to no evidence that Peterson at the time he accepted transfer of the Cadillac papers had any knowledge that there were not sufficient funds in bank to pay plaintiff for it. On the contrary, there were such funds and had it not been for the error in naming the payee on the first check, that check would have been paid had it been submitted promptly by plaintiff, and as a mortgagee who had many times floored cars for Hillsborough there was no requirement that Peterson investigate its books before acting.

2. It is true that shortly after he advanced the money for the Cadillac he discovered that Hillsborough was in bad financial condition. He then took over the inventory to protect himself as to the indebtedness owing to him other than on

---

[3]The court expressly refused to find that defendant was associated with or employed by Hillsborough.

[4]'The burden is on the one coming into a court of equity for relief to prove not only his legal rights but his clean hands . . .'' (*De Garmo* v. *Goldman* (1942) 19 Cal.2d 755, 765 [123 P.2d 1].)

this transaction. If he thereby secured a preference over other creditors, it was a transaction remote from the one in question.

3. As to the contention that Peterson's contract with Hillsborough under which Peterson agreed to floor cars and render services was usurious, in the particular transaction with which we are concerned, the transfer by Hillsborough to Peterson of the Cadillac, there is no evidence of usury. Nor does plaintiff point out any respect in which the $1,500 per month to be paid Peterson for his services as "buyer," constitutes usury.

Plaintiff urges that the court should have made a finding as to whether defendant had clean hands. No request was made for such a finding. The only authority cited by plaintiff for the proposition that there must be such a finding is *De Garmo* v. *Goldman, supra,* 19 Cal.2d 755, where the court said (p. 764): "Upon the second issue of good faith, the court made no finding although it is the duty of a court of equity, upon any suggestion that a plaintiff has not acted in good faith concerning the matters upon which he bases his suit, to inquire into the facts in that regard." There, in an action for the removal of directors of a corporation for fraud, the answer to the complaint set up a number of actions and failure to act of the plaintiff, which, if true, constituted a lack of good faith upon the part of the plaintiff. In the quoted portion of the opinion the court merely recited that the court had not found on the issue of lack of good faith concerning the matters upon which the plaintiff had brought the suit and then went on to point out the many acts of the plaintiff showing lack of good faith on the part of the plaintiff. It then said (p. 766) that "[u]nder these circumstances" the failure of the court to make a direct finding on the subject necessitated a reversal.

In the instant case, the court found that Peterson "reasonably" relied on the indicia of ownership sent out by plaintiff. Had he not been acting in good faith, he could not have been held to have had reasonable reliance on plaintiff's acts. In view of that finding and the fact that evidence shows Peterson's good faith in the transaction, the failure of the court to make a more direct finding is not fatal.

Plaintiff also contends that no evidence of a default was present giving Peterson the right to sell the vehicle and in *any event Morris Plan* at that time held the security interest. Actually Hillsborough was in default to Peterson. However,

these factors are irrelevant as between plaintiff and Peterson. As plaintiff is estopped to claim the car from Peterson, he cannot complain of matters concerning Hillsborough and Morris Plan.

2. *May Peterson Retain Profits of Sale of Cadillac?*

As before stated, Peterson sold the Cadillac for a net of $4,450. The amount that he advanced Hillsborough for flooring the car was $3,655. Thus there was a profit on the sale of the car of $795, which sum he applied on Hillsborough's general indebtedness to him. ■ As said in *Peskin* v. *Phinney* (1960) 182 Cal.App.2d 632, 636 [6 Cal.Rptr. 389]: "Respondent's contention ignores the remedial limitations of the doctrine of estoppel. The doctrine acts defensively only. It operates to prevent one from taking an unfair advantage of another but not to give an unfair advantage of one seeking to invoke the doctrine. [Citations.] Or as stated in 31 Corpus Juris Secundum, Estoppel, section 152, at page 440: 'The doctrine of estoppel does not extend to matters affecting the remedy only, which are foreign to, and disconnected from, the contract or the character in which the parties entered into it; and when applied it should be only to the extent of protecting the party who has been misled against the loss actually occasioned thereby . . .' "

■ That Hillsborough was indebted to Peterson in excess of the sum advanced on the Cadillac does not entitle Peterson as against plaintiff to retain the amount received by him over and above that paid by him to Hillsborough by reason of his reliance upon plaintiff's acts. The estoppel protects only his security interest in the automobile and does not allow him to retain any excess he received. Peterson's contractual rights against Hillsborough are not relevant as to plaintiff. If Peterson was out of pocket by reason of plaintiff's acts, more than the exact sum he advanced to Hillsborough to floor the car, the burden was on him of proving it. Peterson made no showing of loss therefrom other than the $3,655 advanced to Hillsborough. Plaintiff is entitled to recover $795 from Peterson. The legal situation is that as the title to the Cadillac did not actually pass from plaintiff to Peterson, the latter converted plaintiff's automobile, and the proceeds of the sale of the automobile are held by Peterson for plaintiff. However, by reason of plaintiff's acts plaintiff is estopped to recover from Peterson that portion of the proceeds representing the amount advanced by Peterson to Hillsborough on the car.

*Clementson's Appeal*

*Alter Ego.*

The court found that there existed such unity of interest and control between defendants Hillsborough, Furst, Butler, and Clementson that Hillsborough was the *alter ego* of said persons; that the corporate entity should be disregarded and therefore these individuals were liable to plaintiff for the value of the car. This question is essentially one of fact. Defendant Clementson contends that the evidence does not support the finding. Although this element was only peripherally introduced at the trial, there is substantial evidence supporting the finding.

The corporation was formed in the summmer of 1959. The articles of incorporation were executed by the individuals July 3, 1959, and filed with the state July 15. Clementson put up $12,500 in cash on his subscription to capital stock. There were unpaid subscriptions of $3,800 due from Butler and $2,500 due from Furst, evidenced by promissory notes. Later Clementson's wife loaned the corporation $9,170. No application was ever made to issue corporate stock and no stock was ever issued. Clementson was president, Butler vice president, and Furst general manager. Furst ran the business. Clementson dealt with the reconditioning of the cars in the rear of the establishment. Butler primarily was a buyer and salesman. All three were directors. No corporate meetings were ever held, although all three individuals met frequently to discuss business problems. Apparently no official minutes were kept. None appear in the record.

The accountants who audited Hillsborough's books found the principal accounting records to be wholly inadequate. There was no internal control to safeguard the corporation's cash receipts, nor to guard against improper disbursements of corporate funds from the bank account. The cash receipt books were either incomplete or missing. The accountants found that approximately $1,236 was withdrawn from the corporate bank account to discharge Furst's personal obligations. During the short period of the operation of the corporation (approximately 5 months) Furst drew as salary $7,400, Butler $6,900, Clementson $4,800. The gross sales of the corporation August 1, 1959, to January 25, 1960, were $294,432.71. The gross income (sales less cost) was $13,450.18. Operating expenses were $77,807.17, leaving a net operating *loss* of $64,356.99.

Clementson knew nothing of the corporation's unhealthy

condition until the latter part of December or early January. Nor did he know of the transaction with plaintiff. However, he had access to all records and was present at the business premises most of the time.

 Mr. Justice Molinari in a recent opinion of this court summarizes the conditions under which a corporate entity may be disregarded: (1) Such a unity of ownership and interest that the separate personalities of the corporation and the individual no longer exist. (2) If the acts (relied on by the plaintiff) are treated as those of the corporation alone, an inequitable result will follow. (*Associated Vendors, Inc.* v. *Oakland Meat Co., Inc.* (1963) 210 Cal.App.2d 825, 837 [26 Cal.Rptr. 806].) Bad faith is an underlying element which will be found in the cases where the corporate entity was justifiably disregarded by the trial court. The basic consideration on appeal is whether the trial court's finding is supported by substantial evidence; the question is one of fact. (*Idem,* at pp. 840-842).

In the instant case it is seen that Clementson was an incorporator, a director, and an officer, as were the other two defendants. No other persons had a direct interest in the corporation.

Several other factors pointed out in *Associated Vendors* as being pertinent to a trial court's decision to disregard the corporate entity are present in the instant case. (1) There was a significant diversion of corporate funds to other than corporate uses. (2) There was a failure to issue stock or obtain a permit to do so. (3) Corporate records and minutes were inadequately maintained or not maintained at all. These facts seem sufficient evidence of bad faith. That the defendants drew what seem to be extremely large salaries in light of the corporation's net income and the rapid decline of the corporation into insolvency is also notable.

Defendant Clementson contends that although he was an incorporator, director and president of the corporation he knew nothing of its financial affairs and had nothing to do with its business other than in the reconditioning of its cars and that therefore there was no evidence of the bad faith upon his part which is required to enable the court to pierce the corporate veil. Bad faith, however, must be imputed to Clementson at least by his negligence in permitting a situation to exist where the dealings were in form with a corporation but in reality with the individual incorporators. The individuality or separateness of the persons and corporation had

ceased, if it had ever existed. (Cf. *Minifie* v. *Rowley* (1921) 187 Cal. 481, 487 [202 P. 673].) Corporations Code section 308, providing, ''The corporate existence begins upon the filing of the articles,'' and section 313, providing that the certificate of incorporation is ''prima facie evidence of its corporate existence,'' provide merely for a naked existence. Whether the corporation actually functions as a corporation is a question of fact. It was Clementson's duty, as president, if he desired the protective cloak of the corporation, to see that the corporation did so function.

Given the *alter ego* finding, which appears to be supported by substantial evidence, it thus follows that it would be inequitable for McKee to be without recourse against the individual defendants. Nor is it apparent that Clementson should be severed from the others.[5] He was an incorporator, a director, and an officer. He drew a large salary. He had access to the records. He was physically present. He does not appear to be merely a dupe; he could have asserted himself at any time.

As herein pointed out, plaintiff is entitled to a judgment against defendant Peterson in the sum of $795. Therefore the judgment is reversed and the cause is remanded to the trial court with directions to enter a judgment in favor of plaintiff against all defendants in the sum of $795, and in favor of plaintiff and against all defendants other than Peterson in the sum of $4,180. Plaintiff will recover costs from defendant Clementson. As between plaintiff and defendant Peterson each party will bear his own costs.

Sullivan, J., and Molinari, J., concurred.

---

[5]*Wilson* v. *Stearns* (1954) 123 Cal.App.2d 472 [267 P.2d 59], is not analogous to the instant case. The defendant Hall there was found not to be a stockholder nor was he an incorporator. Thus Clementson's reliance on the case is misplaced.