WINSTON STOODY AND SANDRA STOODY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1127-73.     Filed July 14, 1976.

*Thomas H. Carver,* for the petitioners.
*Darrell B. McDaniel,* for the respondent.

IRWIN, *Judge:* Respondent determined deficiencies in petitioners' Federal income tax for the calendar years 1968 and 1969 in the amounts of $4,568 and $3,716, respectively. The sole

issue raised in this litigation is whether payments made by Winston Stoody under a settlement agreement entered into to settle a lawsuit are deductible in full in the years of payment or are subject to the capital loss limitations of section 1211 of the Internal Revenue Code of 1954.[1]

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference.

Petitioners Winston Stoody and Sandra Stoody, husband and wife, resided in Whittier, Calif., at the time of filing their joint income tax returns for the years 1968 and 1969. Such returns were filed at the Internal Revenue Service Center in Ogden, Utah. The designation "petitioner" will hereafter refer only to Winston Stoody.

In early 1961 Mr. Vincent Zazzara (hereafter referred to as Zazzara) contacted petitioner concerning the creation and operation of a retail discount store in Burbank, Calif. Although there were other individuals involved in setting up the discount store, Zazzara was the prime organizer and moving force behind the project.

The store was to operate under the name of Know 'Em You or Know 'Em You, Inc. Articles of incorporation of Know 'Em You, Inc. (hereafter referred to as KEY), were filed with the secretary of state of California on June 14, 1961. However, KEY never issued stock to any shareholders, never held any shareholders' meetings, and never elected directors. The affairs of KEY were conducted almost entirely by Zazzara, as its president.

On July 6, 1961, KEY entered into a lease agreement with Gordon K. Jones and Bill H. Roberts covering the premises on which the proposed discount store was to operate. The lease was signed on behalf of the lessee, KEY, by Zazzara as president of the corporation.

Between October 17, 1961, and December 1, 1961, KEY entered into 15 lease agreements with American Guaranty Corp., whereby KEY acquired the use of equipment and fixtures necessary for the store's operation. In order to induce American Guaranty Corp. to lease the equipment and fixtures to KEY,

---

[1] All statutory references herein refer to the Internal Revenue Code of 1954 as in effect for the years in issue.

petitioner and others executed a "continuing guaranty" on October 9, 1961 (hereafter referred to as the guaranty agreement). Under this guaranty agreement petitioner guaranteed performance of all KEY's obligations under the leases executed or to be executed with American Guaranty Corp. Subsequently, on April 2, 1962, American Guaranty Corp. assigned all its interests in the lease agreements and guaranty agreement to American Guaranty Corp. of California.

The KEY store, also known as KEY Co-op Store, opened for business on November 24, 1961. In March 1962 the store ceased business operations.

As a result of the failure of the discount store, many lawsuits were filed against KEY, Zazzara, petitioner, and others, by creditors of the business. Of the lawsuits instigated against petitioner, two were filed by American Guaranty Corp. of California: one in 1962 and one in 1963. Petitioner was sued in these lawsuits as guarantor of the obligations of KEY under the guaranty agreement executed on October 9, 1961.

Subsequently, American Guaranty Corp. and American Guaranty Corp. of California experienced financial difficulties and went into receivership. In 1965 a lawsuit was filed by Harry Burton, as receiver for American Guaranty Corp. and American Guaranty Corp. of California, against petitioner as one of the guarantors under the October 9, 1961, guaranty agreement. The lawsuits filed by American Guaranty Corp. of California in 1962 and 1964 were dismissed without prejudice on February 6, 1968, and January 31, 1968, respectively.

On June 28, 1968, an "Agreement of Settlement and Compromise and Full Release" (hereafter referred to as the settlement agreement) was executed by American Guaranty Corp., American Guaranty Corp. of California, Harry Burton, and Winston Stoody, whereby petitioner agreed to pay American Guaranty Corp. a total of $44,400 (with payments to last over a 5-year period), in exchange for which petitioner was relieved of liability under the guaranty agreement. The lawsuit filed in 1965 by Harry Burton, as receiver for American Guaranty Corp. and American Guaranty Corp. of California, against petitioner was then dismissed with prejudice on September 12, 1968.

Pursuant to the settlement agreement petitioner paid the following amounts to American Guaranty Corp. during the years in issue:

| Year | Amount |
|------|--------|
| 1968 _____ | $10,915 |
| 1969 _____ | 8,775 |

Petitioner deducted the full amount of each payment on his income tax returns for the respective years. Respondent disallowed all but $1,000 of each of the claimed deductions on the ground that the losses sustained were nonbusiness bad debt losses.

At all relevant times petitioner was employed by Stoody Co., a California corporation engaged in manufacturing welding materials and equipment. In 1961 petitioner was vice president of Stoody Co. and owned about 10 percent of its stock. Employment by Stoody Co. was petitioner's only trade or business at the time the guaranty agreement was executed. Petitioner was never employed by KEY, never participated in its operations, and never performed services for it.

## OPINION

The only issue which we have to decide is whether the payments made by petitioner under the settlement agreement are deductible in full in the years paid or are subject to the capital loss limitations of section 1211.

Petitioner contends that the payments made under the settlement agreement were made solely for the purpose of avoiding litigation expenses. That is, the payments were made instead or in place of attorney's fees and court costs which would have been incurred had the litigation proceeded to trial. He argues the attorney's fees would have been deductible in full and so should these settlement payments.

Further, petitioner argues, he was not liable as a guarantor of corporate obligations and the dismissals entered in his favor in the California courts are res judicata on this question. On brief, petitioner launched into a detailed discussion of his defenses to the lawsuits filed against him and how such defenses would have prevailed had the cases ever been tried.

Alternatively, petitioner claims that if we find the payments were made pursuant to his obligation as a guarantor, the debts guaranteed were noncorporate debts (making his losses fully deductible under section 166(f)). That is, KEY was not a valid corporation under California law, and the discount store was

being operated by Zazzara as a sole proprietorship. It was only the obligations of Zazzara that petitioner contends were guaranteed.

Finally, petitioner argues the payments were not made under the guaranty agreement and he had no right of subrogation to American Guaranty's claims against KEY. He concludes that the losses sustained do not fall under section 166, but rather are deductible under section 162 or section 165(c)(2).

Respondent contends the payments made pursuant to the settlement agreement were made because of petitioner's obligation as a guarantor. Accordingly, they are deductible only under section 166 as bad debt losses. Respondent argues the debts were nonbusiness bad debts subject to the capital loss limitations of section 1211. Further, respondent argues that because petitioner guaranteed the debts of a corporation, section 166(f) is not applicable.

We think petitioner has misconstrued the applicable law. His motives for settling the lawsuits filed against him are irrelevant in characterizing the payments made in settlement of those lawsuits. In order to determine the deductibility of these payments, we must look to the origin of the claims settled, not at petitioner's primary purpose or motive for settling. *Anchor Coupling Co. v. United States,* 427 F.2d 429, 433 (7th Cir. 1970), cert. denied 401 U.S. 908 (1971); *George Eisler,* 59 T.C. 634, 639 (1973); *Arthur H. DuGrenier, Inc.,* 58 T.C. 931, 937-938 (1972). This is the rule followed by the Ninth Circuit, to which an appeal from our decision herein will lie. *DeMink v. United States,* 448 F.2d 867 (9th Cir. 1971); *Spangler v. Commissioner,* 323 F.2d 913 (9th Cir. 1963). Consequently, petitioner's desire to avoid further litigation expenses is irrelevant to our decision. See *Kimbell v. United States,* 490 F.2d 203 (5th Cir. 1974), cert. denied 419 U.S. 833 (1974).

We realize that in determining the origin of the claims settled we are not restricted to only those claims stated in the pleadings of the lawsuits filed. Indeed, there may have been other claims which were settled by the parties. *George Eisler, supra* at 640. However, under our circumstances, we can find no actual or threatened claims by American Guaranty Corp. of California, American Guaranty Corp., or Harry Burton against petitioner other than those made against him as guarantor of the obligations of KEY. We think, therefore, that the payments in question should be characterized as payments made by a guarantor, and we

so hold.[2]

Generally, losses sustained by a guarantor are treated as bad debt losses deductible, if at all, under section 166. *Putnam v. Commissioner*, 352 U.S. 82 (1956); *M. Seth Horne*, 59 T.C. 319 (1972), affd. 523 F.2d 1363 (9th Cir. 1975).[3]

Petitioner argues that no debt arose in his favor (i.e., he was not subrogated to the rights of the creditors of KEY) upon settlement of the claims made against him. He claims, therefore, his losses were not bad debt losses but rather losses incurred in a transaction entered into for profit, or business expenses deductible under section 162. We need not resolve the question of whether under local law petitioner was subrogated to the rights of the creditors of KEY upon his making payments under the settlement agreement. The Ninth Circuit has held that subrogation is not an essential element in characterizing guarantor losses as bad debt losses. *Horne v. Commissioner*, 523 F.2d 1363 (9th Cir. 1975); *United States v. Hoffman*, 423 F.2d 1217 (9th Cir. 1970), relying on *Stratmore v. United States*, 420 F.2d 461 (3d Cir. 1970). Consequently, even in the absence of any subrogated rights against KEY, petitioner would be relegated to the exclusive provisions of section 166 in seeking deductions for payments made to the creditors of KEY.[4]

We are fully aware of the decisions of this Court indicating that absent a right of subrogation or other debt arising in favor of a guarantor upon his making payment under a guaranty, the losses sustained are deductible as losses incurred in a transaction entered into for profit. We note particularly our decision in

---

[2] Two arguments raised by petitioner can be dismissed rather summarily. Petitioner claims that the State court judgments dismissing the claims filed against him are res judicata on the question of his liability as guarantor of the debts of KEY. In the alternative, he argues at length about his defenses to the lawsuits filed against him.

Leaving aside the question whether the dismissals in the California courts are judgments on the merits, we note that we are not concerned with trying the question of petitioner's liability under local law as guarantor of the obligations of KEY. The truth of the claims filed against petitioner in these cases is not before us. We must merely determine the *nature or origin of the claims* which arose in those cases and which were settled by the payments in question here. Furthermore, in our case the cause of action differs from the State court cases, the issues differ, and respondent was neither a party to those proceedings nor in privity with any party. The doctrine of res judicata, or more accurately "collateral estoppel," is simply not applicable. *Commissioner v. Sunnen*, 333 U.S. 591 (1948).

[3] See also *Lloyd W. Golder*, T.C. Memo. 1976-150.

[4] We note, in addition, that the losses here (even if they could be considered as expenses) were not sustained in petitioner's trade or business. Petitioner stated his only business was that of being vice president of Stoody Co., and the losses here were not in any way related to that trade or business. Consequently, sec. 162 cannot apply.

*Eugene H. Rietzke,* 40 T.C. 443 (1963), upon which petitioner has relied.[5] However, under the rule of *Jack E. Golsen,* 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971), we will follow the decisions of the Ninth Circuit and hold that petitioner's losses are deductible only under the provisions of section 166 and not as losses incurred in a transaction entered into for profit under section 165(c)(2).

Petitioner argues that in the event we determine the payments in question were guaranty payments, their deductibility is governed by section 166(f) because the debt guaranteed was not a corporate obligation.

Section 166(f) provides:

A payment by the taxpayer (other than a corporation) in discharge of part or all of his obligation as a guarantor, endorser, or indemnitor of a noncorporate obligation the proceeds of which were used in the trade or business of the borrower shall be treated as a debt becoming worthless within such taxable year for purposes of this section (except that subsection (d) shall not apply), but only if the obligation of the borrower to such person to whom such payment was made was worthless (without regard to such guaranty, endorsement, or indemnity) at the time of such payment.

The effect of this provision is to render losses arising from certain kinds of bad debts deductible in full without regard to the limitations of section 166(d), concerning the business or nonbusiness character of bad debts.

It is petitioner's position that KEY's failure to issue stock indicates either that the corporation never existed under California law and the business was being conducted by individuals (more particularly, Zazzara), or that because no stock was issued the corporate form should be disregarded. For this latter proposition petitioner offers cases under California law in which the corporate entity was disregarded for the benefit of creditors, because there were no substantial assets, no stock issued, or no permit to issue stock applied for.

We think the question of whether a corporation was formed at all is a question of local law. *Langdon L. Skarda,* 27 T.C. 137, 144 (1956), affd. 250 F.2d 429 (10th Cir. 1957).[6] However, whether the corporate entity (if found to exist) should be disregarded for

---

[5] See also *M. Seth Horne,* 59 T.C. 319, 333 (1972); *Mozelle Rushing,* 58 T.C. 996, 1001 (1972); *Bert W. Martin,* 52 T.C. 140, 147 (1969) (concurring opinion), affd. per curiam 424 F.2d 1368 (9th Cir. 1970), cert. denied 400 U.S. 902 (1970); *Santa Anita Consolidated, Inc.,* 50 T.C. 536, 559 (1968).

[6] See also *M.H. McDonnell,* T.C. Memo. 1965-125.

purposes of Federal taxation is a question of Federal law. *Carver v. United States,* 412 F.2d 233 (Ct. Cl. 1969). Petitioner's cases covering instances where the corporate entity was disregarded under State law for the benefit of creditors are not helpful.

Under California law, once the articles of incorporation have been filed with the secretary of state, the corporation begins its existence. Cal. Corp. Code sec. 308 (West 1955); *McKee v. Peterson,* 214 Cal. App. 2d 515, 29 Cal. Rptr. 742 (1st Dist. Ct. App. 1963). We have not found any California law suggesting that the failure to issue stock or hold shareholders or directors meetings precludes corporate existence. This is true in spite of the fact that the separate corporate entity might be ignored for the benefit of creditors under such circumstances. *Automotriz del Golfo de California v. Resnick,* 47 Cal. 2d 792, 306 P. 2d 1 (1957); *Minton v. Cavaney,* 56 Cal. 2d 576, 15 Cal. Rptr. 641, 364 P. 2d 473 (1961). Petitioner has failed to carry his burden to show that KEY was not a properly formed corporation, and we conclude, therefore, that such corporation did exist.

Having determined that a valid corporation existed, we next consider whether the corporate form should be ignored for purposes of applying Federal income tax laws. The leading case in this area is *Moline Properties v. Commissioner,* 319 U.S. 436 (1943), which is usually cited for the proposition that the corporate entity will not be ignored where it is created for business purposes or it actually conducts business following incorporation. The degree of corporate business purpose or activity required to recognize the separate existence of a corporation is extremely low. *William B. Strong,* 66 T.C. 12 (1976). In our case the corporation was organized for the purpose of conducting a retail discount store. It entered into lease agreements for both real and personal property and actually opened for business for a period of over 4 months. The corporation was not a purely passive dummy, *William B. Strong, supra,* and its existence will be recognized for Federal income tax purposes.[7] Petitioner, therefore, will be considered as the guarantor of a corporate obligation, and the provisions of section 166(f) are not applicable.

---

[7] For other cases in which the corporate entity was recognized for Federal tax purposes absent the issuance of stock or the occurrence of shareholders or directors meetings see *Carver v. United States,* 412 F.2d 233 (Ct. Cl. 1969); *William B. Strong,* 66 T.C. 12 (1976); *Langdon L. Skarda,* 27 T.C. 137 (1956); *Donald F. Schuerholz,* T.C. Memo. 1976-163.

The question remains whether the bad debt losses sustained by petitioner are business bad debts deductible in full under section 166(a)(1), or nonbusiness bad debts (under sec. 166(d)) subject to the short-term capital loss limitations of section 1211. To establish the losses in question as business bad debt losses, petitioner must show that he was engaged in a trade or business and that the losses were proximately related to it. Sec. 1.166-5(b), Income Tax Regs.; *Putoma Corp.,* 66 T.C. 652 (1976).

The evidence in this case indicates that petitioner was engaged in only one trade or business at the time he guaranteed the obligations of KEY: his employment as vice president of Stoody Co. The bad debt losses here were not in any way connected with that trade or business.

Petitioner contends, however, that his dominant motive in making the guaranty was to obtain employment as a vice president of KEY. Cf. *United States v. Generes,* 405 U.S. 93, 103 (1972). The evidence simply does not support this conclusion. Petitioner was never employed by KEY, nor did he perform any services for it. He never participated in the operation of the store. His only involvement was that as guarantor of KEY's obligations. Petitioner even went so far as to testify that he never entered into any transaction to make a profit other than his employment by Stoody Co. Petitioner did state that he was offered a position as administrative vice president of KEY, but because the job involved no duties or services he rejected the offer.

Since the evidence falls far short of indicating that the guaranty was proximately related to petitioner's trade or business, we must conclude that the losses sustained by petitioner can be deducted only as nonbusiness bad debt losses under section 166(d).

*Decision will be entered for the respondent.*