GEORGE SUSSMAN and CHARLOTTE SUSSMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sussman v. Commissioner
Docket No. 7016-76.
United States Tax Court
T.C. Memo 1980-228; 1980 Tax Ct. Memo LEXIS 358; 40 T.C.M. (CCH) 556; T.C.M. (RIA) 80228; June 30, 1980, Filed Julius G. Hirsch, for the petitioners. Barry C. Feldman, for the respondent. FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION FORRESTER, Judge: Respondent has determined a deficiency in petitioners' *359 Federal income tax for the taxable year 1973 in the amount of $10,194.65. Concessions having been made, the only remaining issue to be decided is whether payments made by petitioner under a guarantee of a corporate debt are deductible as business bad debts or as nonbusiness bad debts, pursuant to section 166(a) [1] and section 166(d), respectively. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners are husband and wife who resided in Albertson, New York, at the time the petition herein was filed. They filed their joint return for the year 1973 with the District Director of Internal Revenue, Brooklyn, New York. Charlotte Sussman is a party to this proceeding solely by virtue of having filed a joint income tax return with her husband and, consequently, George Sussman will hereinafter be referred to as petitioner. Petitioner had been employed since 1948 by Helms Express (Helms), a common carrier in the trucking industry. He had served as its vice president and manager of its eastern *360 division since 1951 in New York City. Additionally, for some time prior to 1968, petitioner had been doing business as Gem West Penn Company (GWP), a sole proprietorship engaged in freight consolidation. GWP's business dealt with the receiving of bulk freight shipments of goods purchased by retail chains and with arranging for their division and transport to individual stores. GWP handled 115 individual stores, including J. C. Penney, W. T. Grant, and Hills Department Stores. GWP was never in the business of actually delivering goods; it merely arranged for delivery by a common carrier who would be paid directly by the consignee. Throughout the sixties, GWP operated out of Helms' terminal under a sublease from them and used their services to deliver freight. In 1967 Ryder Truck (Ryder) negotiated the purchase of Helms which became final in June 1968. Petitioner and other top executives of Helms were informed several months before the June 1968 takeover that they would not be retained. Ryder intended to phase out the arrangement between Helms and GWP, although the reasons for this action are not clear from the record. Soon after Ryder's purchase of Helms, petitioner, being *361 unable to locate a suitable trucking firm with the facilities to handle the work that Helms had been doing, sought to purchase a firm of his own. In the fall of 1968 petitioner began negotiating the purchase of C & L Motor Transportation Company, Inc. (C & L), a trucking company capable of servicing GWP. In January 1969, he organized George Sussman Trucking Company, Inc. (GST), which purchased 100 percent of C & L stock in February 1969, for $56,000 from the Feitelsons, the then sole shareholders of C & L. At the time of the purchase, the Feitelsons entered into a covenant not to compete with C & L, and C & L agreed to pay the Feitelsons $27,000 per year for six years. This agreement provided, in pertinent part: A. Each of the Feitelsons has this day sold all of his stock in C & L and has resigned as an officer and director of C & L. B. C & L desires to ensure that the Feitelsons will not compete with C & L in the next 6 years. NOW, THEREFORE, it is agreed as follows: 1. Each of the Feitelsons agrees that for a period of 6 years from the date hereof he will not directly or indirectly either individually or jointly as a principal, agent, stockholder, employee or in *362 any other capacity, engage in the business of transportation of general commodities in competition with C & L in the State of New York without the prior written consent of C & L and further agrees that during the said 6 year period he will not disclose to any party any information which would adversely affect the business of C & L. 2. In consideration of the Feitelsons' agreement as set forth in Paragraph 1, C & L agrees to pay to each Feitelson the sum of $9,000 per year in quarterly installments commencing May 1, 1969, being a total of $27,000 per year for the said 6 year period. This agreement shall be binding upon and inure to the benefit of the parties hereunder and their respective legal representatives. IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals the day and year first above written. /S/ Richard Feitelson/Richard Feitelson /S/ Louis Feitelson/Louis Feitelson /S/ Isidore Feitelson/Isidore Feitelson C & L MOTOR TRANSPORTATION CO., INC.
By: /S/ George Sussman/President I do hereby guarantee the payments required to be made By C & L in Paragraph 2 of the foregoing agreement. /S/ George Sussman/George Sussman Petitioner *363 personally guaranteed these payments as a condition of the sale. Three months later GST merged with C & L. C & L operated without a profit until it was adjudicated bankrupt in 1972. Pursuant to his personal guarantee petitioner paid $27,000 to the Feitelsons during 1973. He deducted the entire $27,000 he paid on his return for that year. Respondent has disallowed this deduction, determining that it is not a business bad debt under section 166(a)(1), but rather that it represented a nonbusiness bad debt under section 166(d)(1), and thus is subject to the limitations provided by section 1211. OPINION The only question in dispute is the characterization of this bad debt loss. If it was a business bad debt, then the entire $27,000 is treated as an ordinary loss and is deductible in full against ordinary income pursuant to section 166(a)(1). [2] On the other hand, if the debt was a nonbusiness bad debt, then the loss must be characterized as a short-term capital loss under section 166(d) [3] subject to the capital loss limitations as set forth under section 1211. To qualify for business bad debt treatment petitioner must prove both that he was engaged in a trade or business *364 and that the debt was proximately related to it. See sec. 1.166-5(b), Income Tax Regs.; Whipple v. Commissioner,373 U.S. 193, 204 (1963). The burden of proof here lies with the petitioner. Rule 142, Tax Court Rules of Practice and Procedure.
For purposes *365 of section 166 generally, there is no real difference between a loan made directly to a corporation and a guarantee of a debt owed by it to a third party. See Putnam v. Commissioner,352 U.S. 82 (1956). See also section 1.166-8(b), Income Tax Regs.
At the time when the guarantee was entered into, petitioner was clearly engaged in two trades or businesses: that of being an employee of Helms; and that of being a freight consolidator through GWP. Both at trial and on brief petitioner maintains that the primary purpose behind his acquisition of C & L, and the guarantee of the payments to its former shareholders, was to protect both of his businesses. To the contrary, respondent insists that the acquisition of C & L was chiefly for investment purposes. The test of proximity under section 166 has been defined by the Supreme Court in United States v. Generes,405 U.S. 93, 103 (1972), as "dominant motivation," wherein the Court noted that "only significant motivation is not sufficient." Furthermore, the question of motive relates to the time the guarantee was entered into, not the time the actual payment was made. [4]Stoody v. Commissioner,66 T.C. 710 (1976). *366 For several reasons we believe that petitioner's dominant motivation was investment. First, with respect to petitioner's business as an employee of Helms, he failed to show any relationship between the purchase of a new business and the retention of his employee position. Not only is the record devoid of any evidence that petitioner would have lost his job had he not made the guarantee, but petitioner conceded that, regardless of whatever action he might take, he would not be retained as an employee of Helms. See Imel v. Commissioner,61 T.C. 318 (1973). [5] Furthermore, we are not persuaded by petitioner's argument that placing one's self in a position to continue to receive a salary, regardless of its source, is promoting one's trade or business. Second, as to petitioner's other trade *367 or business, GWP, there is little question that a significant part of his motive for the acquisition of the C & L stock, and the guarantee pursuant thereto, was to obtain both the physical facilities to perform freight consolidation and a common carrier capable of transporting freight on the scale required by GWP. Merely significant, however, does not satisfy the dominant motive test. United States v. Generes,supra. In addition to using C & L to expand GWP's operations, petitioner clearly intended and expected to use GWP to expand C & L's business.He had examined C & L's financial statements and testified that he would not have been content to maintain its business as it was, but that it had a great potential for growth, thus he expected to expand it. Investment motive is further indicated by the fact that petitioner chose to keep C & L and GWP as separate entities, one a sole proprietorship and the other in the corporate form. The record discloses that petitioner's investment motivation was at least equal to his desire to protect GWP. This Court has held that equal motives, although significant, will not support a finding of dominant motivation. Smith v. Commissioner,55 T.C. 260 (1970), *368 remanded for consideration in light of Generes,supra at 457 F. 2d 797 (5th Cir. 1972), opinion on remand 60 T.C. 316, 319 (1973). It follows, therefore, that the payments by petitioner pursuant to the guarantee were not deductible as business bad debts. Finally, assuming arguendo that a dominant business motive could be found in the instant case, we note that the result herein would not change. The payments at issue in the instant case were pursuant to a covenant not to compete, the subject of which was C & L, not GWP. That is, the covenant protected the business of C & L which was trucking. The promissors under the covenant could still have competed with GWP. Viewing the purchase of C & L as part investment and part to promote and protect GWP, the covenant related entirely to the investment aspect--the trade or business of motor freight carrier--a business which petitioner concedes he was not involved in, except as an employee, prior to the acquisition of C & L. The primary, if not the only, purpose of the covenant not to compete was an attempt by petitioner to ensure that his investment in C & L would expand, or at least be *369 preserved. Accordingly, on the record before us, we conclude that petitioner sustained a nonbusiness bad debt of $27,000 for 1973. Because of concessions, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year in issue.↩
2. SEC. 166. BAD DEBTS. (a) General Rule.-- (1) Wholly Worthless Debts.--There shall be allowed as a deduction any debt which becomes worthless within the taxable year. ↩
3. (d) Nonbusiness Debts.-- (1) General Rule.--In the case of a taxpayer other than a corporation-- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness Debt Defined.--For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩
4. Petitioner agress that all cases subsequent to United States v. Generes,405 U.S. 93↩ (1972), turn on whether taxpayer's dominant motive was to protect his investment or to further and protect his own trade or business.
5. Compare with Trent v. Commissioner,291 F. 2d 669↩ (2d Cir. 1961), which is distinguishable on its facts.