JAMES A. MILLER and MAXINE S. MILLER, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Miller v. Commissioner
Docket Nos. 23026-80, 23027-80, 29530-81, 29531-81.
United States Tax Court
T.C. Memo 1984-448; 1984 Tax Ct. Memo LEXIS 222; 48 T.C.M. (CCH) 931; T.C.M. (RIA) 84448; August 27, 1984. *222 Dr. M, an orthopedic surgeon, was the sole shareholder of PC, his professional corporation. In 1971, he as an individual and four others formed G.A.B. Corp. to operate a hospital. Dr. M was a shareholder and officer of G.A.B. In 1971, G.A.B. borrowed $172,500 from a bank, which required the shareholders to personally guarantee the loan. In 1972, Dr. M pledged the assets of his medical practice to the bank. Also in 1972, WW provided stenographic services to G.A.B. In 1973, G.A.B. defaulted on the loan to the bank, which then sued G.A.B. and its shareholders. The case was settled in 1976, and a judgment of almost $146,000 was entered against the defendants. WW also sued G.A.B. for its fee on account of the 1972 stenographic services. In 1973, it received a judgment against G.A.B., which proved uncollectible; it then secured a judgment against Dr. M individually on an "alter ego" theory. In 1976, Dr. M personally paid $3,600 on the bank judgment and $1,800 on the WW judgment; thereafter, PC took over the payments on such judgment and paid $6,600 in its 1977 taxable year and $7,200 in its 1978 taxable year. During 1976, 1977, and 1978, PC also paid $4,500 in legal fees arising *223 out of the bank lawsuit and $1,500 in legal fees arising out of the WW lawsuit. Held:
(1) PC may not deduct the judgment payments and legal fees as ordinary and necessary business expenses. Sec. 162, I.R.C. 1954. (2) Dr. M received constructive dividends by reason of PC's payments of the bank judgment and of the $4,500 in legal fees attributable to the bank lawsuit. (3) Dr. M may deduct the judgment payments made by him or on his behalf as business bad debts. Sec. 166(a), (d), I.R.C. 1954. Michael W. Frye and Robert A. Housman, for the petitioners. Steven M. Roth, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined the following deficiencies in the petitioners' Federal income taxes: Taxable Year
Docket No.
Petitioner
Ended
Deficiency
23026-80
James and Maxine
12/31/76
$3,508
Miller
29531-81
James and Maxine
12/31/77
3,464
Miller
12/31/78
5,253
23027-80
James A. Miller,
9/30/76
977
M.D., Inc.
9/30/77
4,866
29530-81
James A. Miller,
9/30/78
3,406
M.D., Inc.
After concessions by the parties, the issues remaining for decision are: (1) Whether the professional corporation owned and operated by Dr. Miller, an orthopedic surgeon, may deduct, as ordinary *224 and necessary business expenses under section 162 of the Internal Revenue Code of 1954, [2] its payments on a judgment against Dr. Miller arising from his guarantee of a loan to a corporate hospital and its payments of the legal fees incurred in two lawsuits arising from the operation of such hospital; (2) whether Dr. and Mrs. Miller received constructive dividends by virtue of the payment by the professional corporation of such judgment and legal fees; (3) whether Dr. and Mrs. Miller may deduct the judgment payments made by him or on his behalf as business bad debts (section 166(a), (d)); and (4) in the alternative, whether Dr. and Mrs. Miller may deduct such judgment payments as interest (section 163(d)). FINDINGS OF FACT Most of the facts have been stipulated, and those facts are so found. The petitioners Dr. James A. Miller and Maxine S. Miller are husband and wife who maintained their legal residence in Los Angeles, Calif., at the time they filed their petitions. They filed their joint Federal income tax returns for 1976, 1977, and 1978 with the Internal Revenue Service Center, *225 Fresno, Calif. The petitioner James A. Miller, M.D., Inc. (the professional corporation), is a professional corporation with its principal place of business in Los Angeles, Calif., when it filed its petitions. It filed its U.S. Corporation Income Tax Returns for its taxable years ended September 30, 1976, September 30, 1977, and September 30, 1978, with the Internal Revenue Service Center, Fresno, Calif. We shall refer to the taxable year of the corporate petitioner by the calendar year in which it ended. Dr. Miller has been an orthopedic surgeon since 1958. The professional corporation was incorporated on July 1, 1971. During the years in issue, Dr. Miller was the president and sole shareholder of the professional corporation. Mrs. Miller was the corporate secretary during the years in issue. Prior to the formation of the professional corporation, 80 percent of Dr. Miller's work in a hospital was spent at Morningside Hospital, which is located 1-1/2 miles from his office. He also practiced at the City View Hospital, the UCLA Dominguez Valley Hospital, and the Temple Hospital, all of which are located 10 to 17 miles from his office. In November 1971, Dr. Miller formed G.A.B. *226 Corporation (G.A.B.) with two other doctors, a pharmacist, and an attorney. G.A.B. was formed to operate the Manchester Hospital (the hospital), which was to be located one-half block from Dr. Miller's office. Dr. Miller contributed $1,600 to G.A.B.'s capital in 1971. Dr. Miller was the president of G.A.B. from 1971 through 1973, and he also served as the hospital's medical director. Notwithstanding Dr. Miller's responsibilities in connection with G.A.B., he maintained a full-time medical practice. G.A.B. did not own the property on which the hospital was located. Dr. Miller believed that being the medical director of a hospital located near his office would benefit his practice in several ways and also increase his income. Dr. Miller believed that if he worked at one hospital located near his office instead of traveling among four hospitals, he could triple or quadruple his patient load. As medical director of the hospital, Dr. Miller had authority over all aspects of its business, including treatment, equipment, and personnel. Dr. Miller hoped that through his control of the hospital, he could minimize the problems that he had observed in other hospitals, including insufficient *227 or poorly trained staff, delays in treatment, equipment shortages, and reluctance in treating medicare and mediCal patients. Finally, Dr. Miller expected to earn an annual salary of between $25,000 and $45,000 as the hospital's medical director. However, he did not, in fact, receive a salary from G.A.B. On November 12, 1971, G.A.B. borrowed $172,500 from Manufacturer's Bank (the bank). As a condition for making the loan, the bank required that each shareholder and his wife sign a continuing guaranty. Dr. Miller and his wife personally guaranteed loans to G.A.B. up to $250,000. Dr. Miller could not have been the medical director of the hospital had he not signed the guaranty. On November 12, 1971, Dr. and Mrs. Miller assigned a life insurance policy to the bank as collateral. The Millers also pledged various stocks that they owned to the bank. On July 14, 1972, Dr. and Mrs. Miller executed a security agreement granting the bank a security interest in the assets of "the Medical Practice of James A. Miller, M.D." Dr. Miller was shown as the borrower on both the security agreement and the financing statement, and he and his wife signed both documents as individuals. Such documents *228 did not mention the professional corporation. The security agreement provided that the security interest "secures payment of any and all of Borrower's Indebtedness (including all debts, obligations, or liabilities now or hereafter existing, absolute or contingent, and future advances) to Bank." The financing statement was filed in February 1973 with the California Secretary of State. During 1972, World Wide Dictation (World Wide) provided stenographic services to the hospital. Such services included recording the details of operations. On or about April 11, 1973, G.A.B. defaulted on its loan payments. On August 30, 1973, the bank's representatives filed a complaint against G.A.B., its five shareholders and their wives, among others. The complaint alleged a cause of action against G.A.B. on the note and a separate cause of action against the shareholders and their wives on their guaranties; in each cause of action, the plaintiff sought $94,727.64 in unpaid principal, in addition to interest, late charges, and attorney's fees. In March 1976, G.A.B. was adjudicated bankrupt. In the same smonth, a stipulation for entry of judgment was entered in the bank's lawsuit against G.A.B. and *229 the guarantors. The stipulation provided that judgment would be entered against G.A.B. and each of the shareholders and his wife jointly as individuals, in the amount of $145,935, consisting of $94,728 of principal, $30,662 of interest, $2,432 of late charges, and $18,714 for attorney's fees. The stipulation further provided that the bank would not levy execution upon the judgment so long as the shareholders each paid the bank $600 per month. The shareholder's payments were to commence on April 15, 1976. Each shareholder was to continue making such monthly payments until the full judgment amount, together with interest thereon at 12 percent per annum from April 15, 1976, was paid in full or until the shareholder's total payments equalled 50 percent of the total judgment amount, whichever occurred first. The stipulation did not provide whether the shareholder payments were to be applied first to interest or to principal. Dr. and Mrs. Miller made 6 monthly payments of $600 each out of their personal checking account during 1976 pursuant to the stipulation. They were then advised by their accountant that, in his opinion, the judgment payments were a business expense properly payable *230 by the professional corporation. The professional corporation made the monthly payments for November and December 1976 and for each month thereafter through December 1978. World Wide sued G.A.B. for an outstanding debt, and on February 9, 1973, World Wide secured a judgment against G.A.B. When the judgment against G.A.B. proved uncollectible, World Wide then obtained a judgment against Dr. Miller and others in the total amount of $6,029.02 on an "alter ego" theory. Such judgment was entered on July 12, 1974, and a writ of execution was issued on July 31, 1974. By agreement with World Wide, Dr. and Mrs. Miller made monthly payments of $300 until the judgment debt was satisfied. The Millers made six such payments during 1976. During its 1976, 1977, and 1978 taxable years, the professional corporation made payments for legal fees totaling $4,500 in connection with the bank lawsuit and $1,500 in connection with the lawsuit brought by World Wide. It paid $3,000 in its 1976 taxable year, $1,000 in its 1977 taxable year, and $2,000 in its 1978 taxable year. On their income tax return for 1976, Dr. and Mrs. Miller deducted the $3,600 that they paid to the bank in that year on the judgment. *231 The professional corporation deducted the judgment payments that it made during its 1977 ($6,600) and 1978 ($7,200) taxable years on its income tax returns for such years. It also deducted the legal fees it paid in connection with the lawsuits brought by the bank and by World Wide on its income tax returns for its 1976, 1977, and 1978 taxable years. In his notices of deficiency, the Commissioner determined that Dr. and Mrs. Miller were not entitled to deduct their 1976 judgment payments. He also determined that the professional corporation was not entitled to deduct its payment of the judgment and legal fees on its returns for its 1976, 1977, and 1978 taxable years and that the judgment payments constituted constructive dividends to Dr. and Mrs. Miller for 1976, 1977, and 1978. Finally, in post-trial amendments to his answers, the Commissioner asserted that Dr. and Mrs. Miller received constructive dividends of $3,000 in 1976 and $1,500 in 1978 by virtue of the professional corporation's payments of the legal fees arising out of the bank's lawsuit. OPINION The first issue for decision is whether the professional corporation may deduct its payment of the judgment and legal fees *232 arising out of the lawsuits as ordinary and necessary business expenses under section 162. The petitioners contend that the professional corporation made the payments to protect its assets, which it asserts were subject to the security interest that Dr. Miller granted the bank in 1972. They conclude that the professional corporation's judgment and legal fee payments were thus ordinary and necessary business expenses within the meaning of section 162. See Lohrke v. Commissioner,48 T.C. 679, 684-685 (1967); Dinardo v. Commissioner,22 T.C. 430 (1954). The petitioners bear the burden of proof with respect to this issue. Rule 142(a), Tax Court Rules of Practice and Procedure[3]; Welch v. Helvering,290 U.S. 111 (1933). The petitioners' argument bases the deductibility of the judgment payments and legal fees upon the adverse business consequences that could result to the professional corporation from a failure to defend the litigation and pay the judgment. However, it is well settled that the deductibility of litigation expenses and payments made pursuant to a judgment or in settlement of litigation depends *233 upon the origin of the claim that culminated in the litigation, judgment, or settlement; such expenses or payments are not rendered deductible under section 162 or 212 merely because the payor believed that such payments were necessary to protect its business or income-producing assets from its claimants or creditors. United States v. Gilmore,372 U.S. 39 (1963); McDonald v. Commissioner,592 F.2d 635, 638 (2d Cir. 1978), revg. a Memorandum Opinion of this Court; Stoody v. Commissioner,66 T.C. 710, 714 (1976); see also United States v. Hilton Hotels Corp.,397 U.S. 580 (1970); Woodward v. Commissioner,397 U.S. 572 (1970); Clark Oil and Refining Corp. v. United States,473 F.2d 1217 (7th Cir. 1973); Anchor Coupling Co. v. United States,427 F.2d 429 (7th Cir. 1970); Spangler v. Commissioner,323 F.2d 913 (9th Cir. 1963), affg. a Memorandum Opinion of this Court; Boothe v. Commissioner,82 T.C. 804 (1984). Accordingly, to determine whether the professional corporation may deduct the judgment payments and legal fees, we must examine the origin of the claim giving rise to such expenditures. In the present case, the claim that resulted in the judgment arose from Dr. Miller's guaranty *234 of the bank's loan to G.A.B. We conclude that the judgment and legal fee payments that ultimately resulted from the guaranty liability are not deductible pursuant to section 162. Losses sustained by a guarantor are treated as bad debt losses, deductible under section 166 or not at all. [4]Putnam v. Commissioner,352 U.S. 82, 85, 88 (1956); Stoody v. Commissioner,66 T.C. at 715; Horne v. Commissioner,59 T.C. 319, 335-336 (1972), affd. 523 F.2d 1363 (9th Cir. 1975). The rule is not avoided merely because a third party assumes a guarantor's liability and sustains the loss. [5] *235 Accordingly, the professional corporation is not entitled to deduct any portion of the judgment payments and legal fees pursuant to section 162. We sustain the Commissioner's determination with respect to this issue. [6] *236 The second issue for decision is whether the Millers received income by virtue of the professional corporation's payment of the judgment and legal fees. The Commissioner contends that such payments resulted in constructive dividends to the Millers, while the petitioners argue that the primary beneficiary of such payments was the professional corporation or, alternatively, that the payments constituted a loan to Dr. Miller. The petitioners bear the burden of disproving the Commissioner's determination regarding the judgment payments. Rule 142(a); Welch v. Helvering,supra.However, since the Commissioner's claim that legal fees in the amount of $4,500 paid by the professional corporation constituted a constructive dividend was first asserted in an amendment to his answer, the Commissioner bears the burden of proving that such payments constituted a constructive dividend to the Millers. Rule 142(a); Achiro v. Commissioner,77 T.C. 881, 889-890 (1981). *237 Corporate payments to third parties at the direction of shareholders, or in discharge of the shareholders' debts and liabilities, may constitute a constructive dividend. TennesseeSecurities, Inc. v. Commissioner,674 F.2d 570, 573 (6th Cir. 1982), affg. a Memorandum Opinion of this Court; Gardner v. Commissioner,613 F.2d 160 (6th Cir. 1980), affg. a Memorandum Opinion of this Court; Wortham Machinery Co. v. United States,521 F.2d 160, 164 (10th Cir. 1975); Sachs v. Commissioner,277 F.2d 879, 882 (8th Cir. 1960), affg. 32 T.C. 815 (1959); Yelencsics v. Commissioner,74 T.C. 1513, 1529 (1980); Magnon v. Commissioner,73 T.C. 980, 997 (1980). When a corporation confers an economic benefit upon a shareholder in his capacity as such, without an expectation of repayment, that economic benefit becomes a constructive dividend, taxable to the shareholder whether or not the corporation intended to confer a benefit upon him. Loftin and Woodard, Inc. v. United States,577 F.2d 1206, 1214 (5th Cir. 1978); United States v. Smith,418 F.2d 589, 593 (5th Cir. 1969). The basic issue is whether the corporate expenditure was incurred primarily to benefit the corporation's trade or business or primarily *238 for the benefit of the shareholder. Ireland v. United States,621 F.2d 731, 735 (5th Cir. 1980); Loftin and Woodard, Inc. v. United States,577 F.2d at 1215; Magnon v. Commissioner,73 T.C. at 993-994. In the present case, the petitioners reassert their contention that the professional Corporation was the primary beneficiary of the judgment payments because such payments were made to protect the medical practice assets. However, Dr. Miller, not the professional corporation, was liable on the guaranty and on the judgment. The professional corporation was not involved with the loan guaranty or litigation until it began to make judgment payments. Moreover, we are not convinced, from the confused state of the record, that any assets owned by the professional corporation were subject to foreclosure by the bank. [7] *239 In addition, in circumstances indistinguishable from those of the present case, corporate payments of shareholders' liabilities pursuant to guaranties of third-party debts have been held to be constructive dividends. TennesseeSecurities, Inc. v. Commissioner,supra;Wortham Machinery Co. v. United States,521 F.2d at 164. In Tennessee Securities, the principal shareholder-officers of a closely held corporation that was engaged in securities underwriting personally guaranteed a loan to an unrelated fast-food corporation. The shareholders hoped that if the fast-food corporation prospered, it could raise over a million dollars through a public securities offering handled by the corporate underwrited, which would profit handsomely on the offering. The fast-food corporation failed, and the lender sought payment on the guaranty. The shareholders, in their *240 capacity as directors of the underwriter, decided that since the guaranty was entered into for the development of the future business of the underwriter, the obligation was properly a corporate one. The underwriter paid the debt. The Sixth Circuit upheld our determination that the individual shareholders received income upon the underwriter's payment of the debt. Likewise, in Wortham Machinery, the Tenth Circuit held that the satisfaction of shareholders' personal loan guaranty by their closely held corporation contituted a constructive dividend to the shareholder-guarantors. See also Sachs v. Commissioner,supra.
In the present case, the professional corporation's voluntary assumption of Dr. Miller's liability primarily benefitted him. The record is entirely consistent with the conclusion that the hospital venture was engaged in solely by Dr. Miller individually. The character of the judgment payments is not changed merely because Dr. Miller executed the loan guaranty to assist G.A.B. and ultimately to benefit his medical practice and increase his income. TennesseeSecurities, Inc. v. Commissioner,supra.There is no evidence that Dr. Miller ever intended to repay his professional *241 corporation, and the fact that the parties may not have intended to benefit Dr. Miller is simply not determinative. Accordingly, we sustain the Commissioner's determination that the professional corporation's judgment payments constituted a constructive dividend to the Millers. For similar reasons, we conclude that the Commissioner has sustained his burden of proving that the professional corporation's payment of the $4,500 in legal fees attributable to the bank litigation was a constructive dividend to the Millers. The legal fees were expenses arising from Dr. Miller's involvement with G.A.B.; the professional corporation was not a party to the litigation nor to the transactions giving rise to the litigation. Its payment of the Millers' legal fees constituted a constructive dividend to them. See Lack's Maintenance Contractors, Inc. v. Commissioner,703 F.2d 154, 156 (5th Cir. 1983), revg. per curiam on another issue a Memorandum Opinion of this Court. The third issue for decision is whether Dr. Miller may deduct the judgment payments made by him or on his behalf by the professional corporation, [8] as business had debts. Sec. 166(a), (d). Section 166(a)(1) allows a deduction for *242 "any debt which becomes worthless within the taxable year." However, section 166(d)(1) provides that a nonbusiness debt held by an individual is not deductible under section 166(a), but that if a nonbusiness debt becomes worthless, the loss is treated as a short-term capital loss. Section 166(d)(2) defines a nonbusiness debt as a debt other than: (A) a bedt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. If the loss that is incurred when a debt becomes worthless bears a proximate relation to the taxpayer's trade or business, the debt is a business bad debt. Sec. 1.166-5(b)(2), Income Tax Regs.
The loss sustained by a guarantor unable to recover from a debtor is a loss sustained from a bad debt to which *243 the guarantor became subrogated upon the discharge of his liability as a guarantor. Putnam v. Commissioner,352 U.S. at 85, 88-89; Benak v. Commissioner,77 T.C. 1213, 1218 (1981). Where an individual shareholder guarantees the debt of his corporation, the debt created in his favor as a result of his payment of the corporation's obligation is a nonbusiness debt unless such debt is of the types specified in section 166(d)(2)(A) and (B). Sec. 1.166-8(b), Income Tax Regs.[9] *244 A proximate relation between the loss and the taxpayer's trade or business sufficient to qualify the debt as a business debt exists if business considerations were dominant in motivating the taxpayer to guarantee the corporation's obligation. United States v. Generes,405 U.S. 93 (1972); Benak v. Commissioner,supra.Therefore, to be entitled to deduct the judgment payments made by him or on his behalf as a business bad debt, Dr. Miller must prove that his dominant motive in guaranteeing the G.A.B. loan was to further his trade or business rather than to protect his investment in G.A.B. Rule 142(a); United States v. Generes,supra at 100, 106; Benak v. Commissioner,supra.[10] The Commissioner asserts that at the time he guaranteed the G.A.B. loan, Dr. Miller was not an employee of G.A.B. and received no salary from G.A.B. that his guaranty would safeguard. The Commissioner also argues that no other business motives caused Dr. Miller to execute the guaranty. The petitioners contend that Dr. Miller's dominant motivation in guaranteeing the loan was to protect his anticipated salary as the medical director of the hospital and *245 to further his other trades and businesses. The issue of whether business or investment considerations dominated a shareholder-employee's decision to guarantee the debt of his corporation is a factual one. Smith v. Commissioner,60 T.C. 316, 318 (1973). Relevant to the inquiry is the comparison of the taxpayer's investment in the corporation with the salary he receives or expects to receive in his trade or business as a corporate employee. United States v. Generes,405 U.S. at 106-107. The fact that such salary was only anticipated at the time the taxpayer guaranteed the debt is a factor to be considered in resolving the issues of dominant motive ( Putoma Corp. v. Commissioner,66 T.C. 652, 674 (1976), affd. 601 F.2d 734 (5th Cir. 1979)), but such fact alone is far from decisive. [11] Likewise, it is not fatal to the petitioners' claim that the record is unclear concerning whether Dr. Miller was actually employed as the hospital's medical director when he signed the guaranty. [12] We have found that Dr. Miller could not have occupied such position had he not signed the guaranty. His investment in G.A.B. was $1,600; such amount was nominal compared to his anticipated yearly salary of *246 $25,000 to $45,000 as the hospital's medical director. The anticipated salary income was much more immediate than any potential reward on his $1,600 investment; it is inconceivable that Dr. Miller agreed to guarantee a debt of up to $250,000 to protect a $1,600 investment. Moreover, in the present case, Dr. Miller had other business motivations for guaranteeing the G.A.B. loan. Dr. Miller hoped that the hospital's successful operation would greatly benefit his medical practice. The Commissioner argues that the anticipated increase in income would inure to the benefit of Dr. Miller's professional corporation, not to the benefit of Dr. Miller, and thus that his dominant motive in executing the guaranty was to benefit his professional corporation's *247 business rather than his own. But cf. Bowers v. Commissioner,716 F.2d 1047 (4th Cir. 1983), revg. a Memorandum Opinion of this Court. If Dr. Miller had guaranteed the G.A.B. loan merely to increase the profits of his medical practice, the Commissioner's argument would have some merit. However, on this record, his contention is simply insufficient. The Commissioner has conceded that Dr. Miller was in the trade or business of being an orthopedic surgeon apart from his trade or business as an employee of the professional corporation. Dr. Miller had many motives other than increased income when he became involved with G.A.B.; in general, he wished to improve the care that he was able to provide his patients. Dr. Miller believed that by operating his own hospital, he could attend to patients more quickly upon their arrival, insure that necessary equipment was present when needed, control and improve the quality of the hospital staff, and alleviate the welfare and insurance problems that his patients often endured. Such benefits would inure directly to Dr. Miller in his trade or business as an orthopedic surgeon; they would not merely "flow through" to him as an employee of the professional *248 corporation. Improving the quality of the services provided is as closely related to the business of the professional person as is his income. Under these circumstances, the petitioners have sustained their burden of proving that business considerations, arising from Dr. Miller's business as hospital medical director and orthopedic surgeon, rather than investment or personal considerations, dominated Dr. Miller's decision to guarantee the G.A.B. loan. Thus, the present case is distinguishable in this respect from TennesseeSecurities, Inc. v. Commissioner,674 F.2d at 574-576. On brief, the Commissioner has raised for the first time the issue of when the debt became wholly worthless. The issue was not timely presented and our consideration of it at this time time would unduly prejudice the petitioners. In identical circumstances, we stated: On brief, and for the first time, respondent seeks to put in issue the question whether the debt herein became worthless in 1954. He made no such determination in his determination of deficiency, but to the contrary, allowed deduction of the indebtedness as a nonbusiness bad debt. The respondent's contention made on brief and for the first *249 time accordingly has no standing in this case. [Nash v. Commissioner,31 T.C. 569, 574 (1958).] Such conclusion is equally applicable herein. Accordingly, the payments made on the bank judgment by or on behalf of Dr. Miller are deductible by him as business bad debts. Our resolution of this issue obviates the need for us to consider the petitioners' alternative argument that such payments are deductible as interest. To reflect concessions by the parties, Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioner have been consolidated herewith: James A. Miller, M.D., Inc., docket No. 23027-80; James A. Miller, M.D., Inc., docket No. 29530-81; and James A. Miller and Maxine S. Miller, docket No. 29531-81.↩
2. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.↩
3. Any reference to a Rule is to the Tax Court Rules of Practice and Procedure.↩
4. The petitioners do not contend that Dr. Miller or the professional corporation was in the trade or business of guaranteeing loans. ↩
5. The professional corporation did not guarantee the G.A.B. loan, it was not a party to the bank's lawsuit against G.A.B. and the guarantors, and it was not a party to the stipulation of judgment. Ordinarily, a taxpayer does not pay a debt that it is not legally obligated to discharge. Deputy v. DuPont,308 U.S. 488 (1940); Welch v. Helvering,290 U.S. 111 (1933); Friedman v. Delaney,171 F.2d 269 (1st Cir. 1948). Accordingly, a deduction under sec. 162 for a taxpayer's voluntary payment of a judgment rendered against another is generally not allowable. See Okemah National Bank v. Wiseman,253 F.2d 223, 226 (10th Cir. 1958); Wallin v. Commissioner,32 B.T.A. 697 (1935); San-Knit-Ary Textile Mills, Inc. v. Commissioner,22 B.T.A. 754 (1931). The petitioners strenuously argue that the present case is governed by Lohrke v. Commissioner,48 T.C. 679 (1967), and thus that the professional corporation may deduct the expenses and liabilities even though it was not liable for them. We need not determine whether the case is governed by the general rule of Welch v. Helvering,supra, or the exception of Lohrke v. Commissioner,supra, since the claim arose out of the guaranty of the G.A.B. debt. The loss attributable to such claim is not deductible under sec. 162↩ by any party. 6. In its petitions, the professional corporation claimed a deduction for the $1,500 in legal fees related to the World Wide lawsuit, but in their brief, the petitioners argue that such fees are deductible by the Millers individually. Such claim was not pleaded nor supported by proof at the trial, and we do not view the comments of the Commissioner's counsel at the trial as a concession that the Millers may deduct such fees.
7. The professional corporation did not sign the security agreement, and there is no direct evidence connecting the agreement to Dr. Miller's G.A.B. loan guaranty. Dr. Miller did not testify why the bank demanded the security interest; it appears that the bank had made other loans to Dr. Miller and held other collateral from him. Finally, it is not at all clear that the professional corporation owned the assets of the medical practice. The security agreement does not show that it had any interest in such assets. Dr. Miller's testimony indicated that in 1976, the value of the assets of his practice far exceeded the value of the assets that the professional corporation reported on its income tax return for such year.
8. We observe that since we have treated the judgment payments by the professional corporation as constructive dividends to Dr. Miller, he is the proper party to claim the bad debt deduction on account of such payments. TennesseeSecurities, Inc. v. Commissioner,674 F.2d 570, 574↩ (6th Cir. 1982), affg. a Memorandum Opinion of this Court.
9. Sec. 1.166-8, Income Tax Regs., interpreted sec. 166(f). Sec. 166(f), which, in specified circumstances, provided business bad debt treatment for losses incurred by individuals in discharge of their obligations as guarantors of noncorporate debts, was repealed by sec. 605, Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1575, effective for guaranties made after Dec. 31, 1975, in taxable years beginning after such date. Rules applicable to guaranties made after the effective date of sec. 605 are specified in sec. 1.166-9, Income Tax Regs.↩
10. The Commissioner does not contend that the deductibility of the judgment payments was affected by the prior bankruptcy of G.A.B. See Ingersoll v. Commissioner,7 T.C. 34, 37 (1946); but see Goodenough v. Commissioner,T.C. Memo. 1980-28↩.
11. See Estate of Allen v. Commissioner,T.C. Memo. 1982-303; Goodenough v. Commissioner,T.C. Memo. 1980-28; Carter v. Commissioner,T.C. Memo. 1979-447↩. 12. In Goodenough v. Commissioner,T.C. Memo. 1980-28↩, we held that because the taxpayer signed a promissory note with a view toward securing his employment with the automotive franchise to be financed with the loan proceeds, his ultimate payment of the loan was deductible as a business bad debt.