CAROLINE HIBBS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hibbs v. Commissioner
Docket No. 8398-80.
United States Tax Court
T.C. Memo 1986-107; 1986 Tax Ct. Memo LEXIS 504; 51 T.C.M. (CCH) 643; T.C.M. (RIA) 86107; March 18, 1986. Robert B. Leggat, Jr., for the petitioner. Donald L. Wells, for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: In his notice of deficiency respondent determined that deficiencies in income tax were due from Guy O. Hibbs and Caroline Hibbs as follows: Year
Deficiency
1971
$18,373.00
1973
10,930.59
1974
351.12
1975
715.86
A joint petition was filed by Mr. and Mrs. Hibbs, but on December 5, 1980 an order was entered under which the petition was dismissed as to Guy O. Hibbs for lack of jurisdiction and the caption was changed to Caroline Hibbs, Petitioner v. Commissioner of Internal Revenue, Respondent. By an amendment to his answer respondent increased the deficiencies for 1974 and 1975 by $163.82 and $1,088.64, *506 respectively. After concessions, the issues remaining for decision are: (1) whether petitioner in entitled to deductions for employee business expenses in 1973 and 1974 and, if so, the amount thereof; (2) whether petitioner is entitled to certain loss deductions with respect to stock in Mid-Continent Meats, Inc. and with respect to certain expenditures made in its behalf and, if so, the nature, amount, and year of such deductions; (3) whether petitioner is entitled to a loss deduction with respect to stock in Page Boy Meats, Inc. and, if so, the nature and amount of the deduction; (4) whether petitioner is entitled to a deduction in 1975 for a capital loss carryforward from 1963 and, if so, the amount thereof; and (5) whether respondent is entitled to apply any overpayment by petitioner and Hibbs in their 1971 income tax to Hibbs' liability under section 6672[1] for employment taxes due from Omaha Pork Packers, Inc. *507 FINDINGS OF FACT Some of the facts have been stipulated and are so found, the stipulation and related exhibits being incorporated herein by reference. Petitioner, Caroline Hibbs, was a resident of Missouri when she filed her petition. She was married to Guy O. Hibbs (Hibbs) from 1946 until his death in 1980. They filed joint income tax returns for the years 1971, 1973, 1974, and 1975. The 1971 return was filed with the Ogden Service Center. The other returns were filed with the Kansas City Service Center. Hibbs was born in 1922. During all of his adult life from high school graduation to death Hibbs was associated in some manner with farm management, cattle or hog trading, and related service operations including several different meat packing and processing businesses which he organized, owned and/or managed. Most of his business ventures were capitalized with heavy borrowings and as a result usually ended in failures after varying degrees of early success. For instance, in 1956 he organized Hibbs Packing Company which at first was successful but later encountered financial difficulties and closed in 1963, leaving the petitioner and Hibbs personally liable on approximately *508 $100,000 in guaranteed company debts which forced Hibbs to declare personal bankruptcy. From 1963 to 1965 Hibbs was a salaried employee in meat packing plants in Wichita and Chicago. In 1965 he moved to York, Nebraska, and started a small boning operation which eventually led to his formation of a second business through which he began to broker and transport meats to Omaha. Mid-Continent Meats, Inc.
In 1968 Hibbs organized Mid-Continent Meats, Inc. (MCM) with headquarters in Omaha. He was MCM's sole stockholder, president and principal director. Its operation consisted primarily of boning and grinding hams into sausage which was frozen and held in cold storage until it could be properly shipped. For MCM's corporate structure, Hibbs used an existing Nebraska charter previously obtained by Robert Kully (Kully). Kully owned and operated a cold storage and warehousing corporation known as Mid-Continent Cold Storage Company (MCCS) and from 1968 through August of 1973 Hibbs and MCM were closely associated both operationally and financially with Kully and MCCS. In the initial stages of their involvement, the two corporations operated out of the same building and MCM *509 used MCCS's facilities to process and store many of its products and nearly 80 percent of MCM's customers were also customers of MCCS and were actually invoiced through MCCS. Kully controlled the invoicing and provided Hibbs with a daily statement or "zero sheet" summarizing gross receipts and expenses such as freight, demurrage, and rent which MCM owed to MCCS. After offsetting MCM's gross receipts with its expenses, Kully arrived at a net or "balancing figure" which he then charged to a clearing account (account #1202) and thereby brought the daily statement to zero. Hibbs was in charge of the daily operations of MCM and controlled all of its assets except cash and other financial matters which were handled by Kully including bank financing, notes payable, and guarantees as well as the aforementioned customer invoicing. Hibbs had no banking connections in Omaha so at first when MCM needed operating capital Hibbs would contact Kully who would arrange the necessary transfer of funds and make corresponding adjustments in the 1202 account and on the applicable zero sheet.All other transfers of funds between MCCS to MCM resulted in adjustments to the account and the zero sheets *510 which were used at the end of the year in the preparation of MCM's income tax returns. During the years 1969 through 1972 MCM reported gross receipts and retained earnings as follows: Year
Gross Receipts
Retained Earnings
1969
$14,623,462.23
$20,912.86
1970
17,252,481.49
77,522.83
1971
19,734,219.55
149,753.88
1972
27,043,904.00
196,780.00
For 1970, 1971, and 1972 Hibbs received the following salaries from MCM: Year
Salary
1970
$56,000
1971
58,500
1972
82,450
No dividends were paid by MCM during 1970, 1971, and 1972. The company, however, did make advances to Hibbs for payments on an airplane, an automobile, and a vacation home in Michigan. These advances were charged on MCM's books to an "officer's advance" account which account was closed at the end of each year to Hibbs' salary account and included as additional compensation on Forms 1099 issued to him by MCM. On June 1, 1970 petitioner and Hibbs borrowed $16,000 from Center Bank, Omaha, Nebraska.The loan was secured by the assignment of a certificate of deposit (#9761) owned by petitioner and Hibbs as joint tenants. In 1971 Kully arranged *511 a line of credit for MCM at Center Bank. On May 5, 1971 MCM borrowed $600,000 from Center Bank. The loan was represented by a demand note executed by Hibbs individually and as president of MCM. The note was also executed by Kully individually and as president of MCCS. On February 15, 1972 MCM borrowed another $500,000 from Center Bank. This loan was represented by a demand note executed by Hibbs individually and as president of MCM. In 1972 Hibbs and certain other individuals organized Aaron Corporation (Aaron) and Omaha Pork Packers, Inc. (Omaha Pork). In return for $50,000 Hibbs received one-half of the capital stock in Aaron. The stock was not issued under section 1244.With respect to Omaha Pork Packers, Hibbs was an officer, director and minor shareholder. During 1973 Hibbs received salaries of $39,377 from Aaron and $26,500 from Omaha Pork.On June 4, 1973 he also borrowed $30,000 from Aaron which was represented by a promissory note. [2] In 1974 Hibbs received no salary from Aaron and only $4,500 from Omaha Pork. During 1973 Omaha Pork suffered financial reversals which ultimately resulted in its bankruptcy and its failure to withhold certain payroll taxes totaling *512 $80,364.85. In April of 1974 respondent assessed the payroll taxes against Hibbs as the responsible officer of Omaha Pork under section 6672. During the summer of 1973 MCM also began to experience financial problems. By letter dated August 1, 1973, Center Bank advised Hibbs that past payments by MCM on its notes for $600,000 and $500,000 were no longer satisfactory and proposed a schedule for future repayments. On a balance sheet dated August 27, 1973 MCM reported its liabilities exceeded its assets by more than $300,000. At this point Center Bank demanded immediate payment of the notes guaranteed by Hibbs and MCM ceased to do business as of the end of August 1973. On or about September 28, 1973 Center Bank declared the note dated June 1, 1970 in the amount of $16,000 in default; converted its security, the assigned certificate of deposit (#9761), to cash; applied *513 $4,617.38 of the proceeds to the balance due on the note from petitioner and Hibbs; and applied the balance of $10,382.62 to Hibbs' liability as guarantor of MCM's notes to the bank. In 1974 petitioner recovered one-half of the $10,382.62 or $5,191.31 in a civil proceeding against Center Bank. On October 1, 1973 Center Bank named Hibbs as a co-defendant with MCM, Kully, and others in a suit filed in the District Court of Douglas County, Nebraska, in which the bank sought a judgment for the unpaid balances due on the $600,000 and $500,000 promissory notes. Judgment was entered in this matter against MCM and Hibbs for $823,285.73. Although the judgment was not entered until November 8, 1974, prejudgment attachment proceedings were instituted by the bank shortly after the suit was filed under which Hibbs' one-half interest in the family residence which ultimately sold for $11,172.07 and his stock in Aaron Corporation were attached. Both attachments occurred during October of 1973. The $11,172.07 received from his interest in the residence was applied by the District Court to the judgment on December 2, 1974. The stock in Aaron Corporation was sold under the attachment on January 7, 1975 and *514 the proceeds applied to the judgment. The proceedings in the District Court of Douglas County were affirmed by the Supreme Court of Nebraska on November 6, 1975. On their joint return for 1974 petitioner and Hibbs claimed a deduction for Hibbs' lossess in the Aaron stock, the family residence and the certificate of deposit as follows: Aaron stock (cost)
$50,000.00
Family residence
(one-half interest)
$11,172.07
Certificate of Deposit
(one-half interest)
$ 5,191.31
TOTAL DEDUCTION
$66,363.38
With the inclusion of the above deduction the 1974 return reflected an operating loss of $51,285. Consequently, on or about August 15, 1975, petitioner and Hibbs filed with respondent an application for the tentative refund for 1971 of $18,373 which was generated by carrying the net operating loss for 1974 back to 1971. On October 13, 1975 respondent tentatively allowed the refund but credited the entire overpayment to Hibbs' outstanding assessment under section 6672 as the responsible officer of Omaha Pork. Page Boy Meats, Inc.
In March and April of 1974 petitioner was operating a gift shop business in St. Louis, Missouri, as a sole proprietorship. *515 The business was known as the Mole Hole. On March 25, 1974 petitioner, Ben Nalick, and Yetta Nalick organized Page Boy Meats, Inc., a Missouri corporation with offices in St. Louis. Under its corporate charter, Page Boy had an authorized capital of 1,000 shares of common stock with a par value of $1.00 per share. However, the Articles of Incorporation of Page Boy contained a provision which declared that a total of $60,000, or $100 per share, had to be paid in for 600 shares of the corporation's common stock before it could commence business. The initial oral agreement between petitioner and the Nalicks was to the effect that petitioner would invest $30,000 and the Nalicks would invest $30,000 in Page Boy. On April 1, 1974, Page Boy issued 300 shares of its capital stock to petitioner. The stock was not issued under section 1244. On March 26, 1974 petitioner and Hibbs applied to the First Missouri Bank and Trust Company of Creve Coeur, Missouri, for credit in the total amount of $50,000 to be secured by a second deed of trust on real property located at 7 Williamsburg Estates, St. Louis, Missouri. The loan application (offering sheet) contains the following comment: Mr. *516 & Mrs. Hibbs have sold their residence for $135,000.00. The closing date is July 31, 1974. Mr. Hibbs wants to invest $25,000 in Page Boy Meats, Inc., and use the additional $25,000 of the $50,000 Deed of Trust as collateral on a future letter of credit. Mrs. Hibbs is planning to open the Mole Hole at 141 and Clayton, and will utilize the letter of credit. On April 4, 1974, petitioner and Hibbs executed a demand note to First Missouri for $50,000 secured by the deed of trust described in the loan application. [3]
During March and April 1974 both Mole Hole *517 and Page Boy had bank accounts at First Missouri Bank. Petitioner and Hibbs had signatory authority on both accounts. On April 4, 1974, $25,000 was deposited in the Mole Hole account and on April 9, 1974 and April 26, 1974, disbursements were made from the account in the respective amounts of $20,000 and $5,000. On April 9, 1974 and April 26, 1974, deposits were made to the Page Boy account in the respective amounts of $20,000 and $5,000. In 1975 Page Boy became insolvent, ceased doing business, and its stock became totally worthless. As stated hereinbefore, petitioner and Hibbs filed in 1975 a claim on a Form 1045 for the tentative refund for 1971 of the $18,373 generated by carrying back to 1971 a net operating loss deduction from 1974. In his deficiency notice respondent disallowed the operating loss for 1974, the loss carryback deduction to 1971, and the refund for 1971 which had been tentatively allowed in 1975. On the 1973 and 1974 returns petitioner claimed deductions of $21,139 and $26,014, respectively, for employee business expenses incurred in connection with MCM. Respondent disallowed the entire deduction for 1973. With respect to the $26,014 in business expenses *518 claimed for 1974, respondent allowed $9,645 as miscellaneous legal fees on Schedule A and determined that the balance of $16,112 was a nonbusiness bad debt of MCM deductible on petitioner's return as a short term capital loss. On the 1975 return petitioner claimed a loss in the amount of $25,000 on Page Boy stock and a capital loss carryforward from 1963 in the amount of $86,417. Both of these claims were disallowed by respondent in their entirety. OPINION (1) Employee Business Expenses
Petitioner contends that for 1973 she is entitled to deduct as employee business expenses the sum of $21,139, of which $5,139 purportedly consists of attorney's fees paid by petitioner and her now deceased husband, Guy O. Hibbs, in connection with the lawsuit by Center Bank on the two notes which he had co-signed with MCM, and $16,000 in various debts of MCM which were purportedly paid by petitioner and/or Hibbs. Under section 162(a), a taxpayer is entitled to deduct ordinary and necessary expenses incurred in carrying on a trade or business. The taxpayer, however, has the burden of proving that such expenses were in fact incurred, and that they were ordinary and necessary expenses *519 of the trade or business. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). With respect to the attorney's fees and assuming for the moment that any such fees if paid would qualify as a business expense, we note that the record in this case contains no evidence which tends to establish the nature and amount of any attorney's fees paid in 1973. Petitioner merely testified that the suit was instituted by the bank against Hibbs in 1973 and that she and Hibbs interpleaded Kully as a defendant, but no mention is made of attorney's fees or of their amount. On brief, it is argued by petitioner that since the suit was admittedly instituted in 1973 against Hibbs, it can be assumed that attorney's fees were incurred and paid in 1973 in connection therewith. With respect to the $16,000 in debts of MCM, petitioner asserts that at or about the time MCM ceased to do business, either MCM or Hibbs borrowed $16,000 from Omaha State Bank on a note secured by a pledge of Hibbs' stock in Aaron and that the proceeds from the loan were used to pay debts of MCM. Petitioner further asserts that on September 6, 1973, Hibbs paid off the $16,000 note due Omaha State Bank in order *520 to redeem his stock in Aaron and that because of these events, petitioner and Hibbs are entitled to deduct on their 1973 return $16,000 either as an employee business expense under section 162(a) or as a business bad debt under section 166(a). Here again, the record contains no evidence in support of petitioner's assertions other than her vague, self-serving, and at times contradictory testimony. Consequently, while we are satisfied that the loan occurred and that the $16,000 was borrowed, we have no basis for a finding as to how the proceeds of the loan were spent or that their expenditure qualifies for deduction under section 162(a), 166(a), or any other section. Since petitioner has failed to produce even minimal evidence by testimony, documentation, or otherwise to substantiate the deductions claimed for employee business expenses in 1973 and 1974, we conclude that respondent's disallowance of these deductions must be sustained. (2) Losses With Respect To MCM
Petitioner contends that on the joint return for 1973 she is entitled under section 165(a) to a long-term capital loss deduction in the amount of $4,000 for the worthlessness of Hibbs' stock in MCM and that *521 in the same year she is also entitled to a deduction for business bad debt losses under section 166(a) in the total amount of $66,363.38 for Hibbs' loss of the Aaron stock, his interest in their residence, and his interest in the certificate of deposit (#9761), all of which were attached in 1973 and ultimately applied to the judgment obtained by Center Bank against Hibbs. With respect to the stock in MCM, respondent admits that a long-term capital loss is allowable with respect to the stock, but contends that petitioner has failed to establish a basis in the stock of more than $2,000 or the year in which the stock became worthless. In support of his argument that Hibbs' basis in the stock was no more than $2,000, respondent relies upon petitioner's testimony that to the best of her recollection, $2,000 was probably the most Hibbs had for investment when the company was first organized. In support of her position that $4,000 was the amount invested in the stock, petitioner points to MCM's 1970 income tax return which reflects a capital stock account of $4,000 and that Hibbs was the only stockholder of MCM. Petitioner also relies upon the testimony of George Patchen, the accountant *522 for MCM, who testified that Hibbs' original investment in MCM was $4,000. The testimony of petitioner which is relied upon by respondent on this particular point cannot be considered as an admission because such testimony was obviously based solely upon her recollection of a situation as it existed several years before and it is admitted that her knowledge of MCM's corporate activities were sketchy at best. It appears therefore that the entry made on the contemporaneous return of MCM and the recollection of MCM's accountant is a great deal more reliable. Consequently we conclude that Hibbs' basis in the MCM stock and his capital loss in connection therewith was $4,000. With respect to the year in which the stock of MCM became worthless, our findings of fact include the following: (1) that on August 27, 1973, MCM's liabilities exceeded its assets by at least $300,000; (2) that shortly thereafter Center Bank demanded immediate payment in full by MCM of the balance due on the two notes in the original total amount of $1,100,000; (3) that upon MCM's failure to pay the balance due on the notes payable to Center Bank, a suit was instituted in a local court in which the bank ultimately *523 received a judgment against MCM for over $800,000; and (4) that at the end of August of 1973, MCM closed its doors and ceased doing business and never resumed. In view of all the foregoing, it is apparent that in 1973 MCM's stock had no liquidating value because its liabilities exceeded its assets and that an identifiable event (Center Bank's demand for immediate payment of its notes) occurred which caused MCM to cease business operations and which in turn eliminated any reasonable prospect of MCM's stock ever having any future value. The stock therefore became totally worthless in 1973. Morton v. Commissioner,38 B.T.A. 1270 (1938), affd. 112 F.2d 320 (7th Cir. 1940). [4]
On brief, the parties agree that Hibbs' interest in the Aaron stock, the family residence, and the certificate of deposit which together amount to $66,363.38 were applied to the debts of MCM. However, at trial respondent filed an amendment to his answer in which he alleged for the first time that Hibbs was indebted to MCM for $136,000 at the time his interest in the stock, the family residence, and *524 the certificate of deposit was applied to the debts of MCM and, consequently, respondent is entitled to set off this debt against the claimed losses of Hibbs. Inasmuch as this issue constitutes new matter, the burden of proof with respect thereto is upon respondent. Rule 142(a). In support of his contention that Hibbs was indebted to MCM in the amount of $136,000, respondent notes that MCM's final balance sheet of August 27, 1973 contained an asset entitled "note receiveable--Guy Hibbs" in the amount of $136,000. However, respondent's own witness, George Patchen, the accountant for MCM, testified that the $136,000 entry apparently represented MCM's investment in Omaha Port although he was not certain that this was the case because he had at times received unreliable information from MCM. Since the record contains no other evidence in support of respondent's contention, he has failed to carry his burden of proof with respect to the offset as and we conclude that petitioner's bad debt losses are not affected by respondent's theory of equitable setoff. While the parties now agree that Hibbs suffered bad debt losses in the total amount of $66,363.38 as a result of the application *525 of his interest in the Aaron stock, the family residence, and the certificate of deposit to the debts of MCM, they disagree as to the nature of such losses and as to the year in which the losses occurred. With respect to the year in which the losses occurred, petitioner contends that they occurred in 1974 when the judgment was entered against Hibbs. On the other hand, respondent contends that the losses did not occur until 1975 when at least part of the proceeds received from the attachments were applied to the judgment and when the judgment was finally approved by the Supreme Court of Nebraska. It is well settled that the loss of a guarantor, which occurs as the result of the worthlessness of his claim against the original debtor, is sustained in the year in which the guarantor makes the payment of the debt. Putnam v. Commissioner,352 U.S. 82 (1956); Benak v. Commissioner,77 T.C. 1213 (1981); Horne v. Commissioner,59 T.C. 319 (1972), affd. 523 F.2d 1363 (9th Cir. 1975). Therefore, in this case the year in which Hibbs sustained the loss is determined by the year in which he paid the guaranteed debts. The question *526 of when payment was made is complicated, however, because we have found that his interest in the certificate of deposit was applied by the Center Bank to the debts of MCM in June of 1973 while we have found that his stock in Aaron and his interest in the residence were attached in October of 1973, but the proceeds received from the Aaron stock and the interest in the residence were not actually applied to the debts of MCM until December 2, 1974, and January 7, 1975. Nevertheless, it is apparent that Hibbs was deprived of the use of the certificate of deposit, the Aaron stock and his interest in the residence from September and October of 1973 and that any attempt by him after those dated to recover such assets would have been futile. We conclude, therefore, that under the instant facts of record the proceeds of such assets were applied to his guarantee, and his liability as a guarantor was satisfied to the extent of such proceeds, in 1973 and that his claim against MCM for the recovery of such payments was worthless at that time. With respect to whether the bad debts constitute business bad debts and are deductible under section 162(a) or nonbusiness bad debts and deductible as *527 capital losses under section 166(a), the question will turn on whether Hibbs incurred the bad debts in a trade or business. Petitioner contends that the degree and nature of Hibbs' employment activities with MCM are sufficient to establish that he was in the trade or business of being an employee of MCM. Weddle v. Commissioner,39 T.C. 493 (1962), affd. 325 F.2d 849 (2d Cir. 1963). In determining whether the losses incurred were business or nonbusiness, we must look to the "dominant motivation" of Hibbs in guaranteeing the loans. United States v. Geners,405 U.S. 93 (1972). If his dominant motivation was related to his business of being an employee, then the debt is a business bad debt. But if his dominant motivation was to make an investment, then the debt is a nonbusiness bad debt.It is not necessary that protection of his employment be his sole motivation, but it must be his dominant motivation. The time at which the determination of motivation must be made is the date at which Hibbs entered into the guarantee agreements rather than the date upon which the guarantees were honored. *528 Stoody v. Commissioner,66 T.C. 710 (1976). One of the loans was guaranteed in 1971 and the other in 1972, so these are the dates upon which we must determine his motivation. In making the motivation determination, we are expected to "compare the risk against the potential reward and give proper emphasis to the objective rather than to the subjective." United States v. Generes,supra at 104.The objective factors to be considered in this case are the size of Hibbs' salary as compared to his investment as a stockholder and the age and employability of Hibbs at the time he made the guarantee. In 1971 Hibbs received a salary of $58,500 from MCM which constituted nearly 95 percent of his gross income for that year. In 1972 Hibbs received a salary of $82,450 from MCM and the record contains no evidence of any other gross income for that year. We have found that Hibbs was born in 1922 and consequently in 1971 would have been 49 years old and was obviously suffering from a poor financial record including his bankruptcy after the failure of Hibbs Packing Company. We are satisfied from the record as a whole that in 1971 and early in 1972 when he guaranteed *529 the loans made by MCM from Center Bank, his dominant motivation was to protect and extend his employment with MCM. This is especially apparent when his relatively small investment of $4,000 is compared with his salaries from MCM in 1971 and 1972. We conclude, therefore, that the bad debt losses totaling $66,363.38 which Hibbs incurred as a result of the application of his interest in the Aaron stock, the family residence and the certificate of deposit constituted business bad debt losses in 1973. United States v. Generes,405 U.S. 93 (1972). See also Estate of Byers v. Commissioner,57 T.C. 568 (1972). (3) Loss On Stock In Page Boy
The parties agree that petitioner is entitled to a capital loss deduction in 1975 under section 165(g) from the worthlessness of her stock in Page Boy. They disagree, however, as to the amount of her basis in the stock and consequently the amount of the loss. We have found that in March and April of 1974 petitioner was operating a business known as the Mole Hole in St. Louis, Missouri, which business had an account at the First Missouri Bank. We have also found that at or about the end of March of 1974, *530 petitioner, Ben Nalick and Yetta Nalick organized Page Boy Meats, Inc., with offices in St. Louis, and which had an account at the First Missouri Bank. Under its charter, Page Boy had an authorized capital of 1,000 shares of common stock with a par value of $1.00 per share, but under its articles of incorporation, Page Boy could not commence business until a total of $60,000 or $100 per share for 600 shares of its common stock was paid in.Furthermore, we have found that the initial oral agreement between petitioner and the Nalicks was to the effect that petitioner would invest $30,000 in Page Boy and the Nalicks would invest a similar amount and that on April 1, 1974, Page Boy issued 300 shares of its capital stock to petitioner. In our findings, we have also set out that on March 26, 1974, petitioner and her now deceased husband applied to the First Missouri Bank and Trust Company of Creve Coeur, Missouri, for credit in the total amount of $50,000 and that on the application for the loan a comment was inserted to the effect that the loan was being made so that $25,000 could be invested in Page Boy Meats, Inc. We have also found that on April 4, 1974, $25,000 was deposited in the *531 Mole Hole account and that on April 9, 1974 and April 26, 1974, disbursements were made from the account in the respective amounts of $20,000 and $5,000 and that on the same dates identical deposits were made to the Page Boy account. At the trial petitioner testified that her investment in Page Boy stock totaled $25,000, which testimony is corroborated by the above findings and is not affected by the adverse but uncorroborated testimony of Ben Nalick and Harry Lever. We are satisfied from the record as a whole on this point that petitioner's investment in Page Boy stock totaled $25,000 and that she is entitled to a capital loss deduction in that amount for 1975. Petitioner also contends that for the year 1975 she is entitled to a deduction for a capital loss carryforward of $86,417 from the 1963 return. She asserts that the capital loss occurred in 1963 upon the failure of Hibbs Packing Company and represents the capital loss suffered by petitioner and Hibbs as a result of having to pay certain debts of Hibbs Packing Company which they had guaranteed. Petitioner has the burden of proof with respect to this issue. *532 Welch v. Helvering,supra;Rule 142(a). We have found that Hibbs Packing Company failed in 1963 and that as the result of its failure Hibbs declared personal bankruptcy because of approximately $100,000 in Hibbs Packing Company debts which he had guaranteed. The record contains no further evidence with regard to this matter except the vague, self-serving and sometimes contradictory testimony of petitioner, which is insufficient to establish the loss carryforward. Even though uncontradicted in most respects, her testimony on this point is at least questionable and cannot be accepted. See Demkowicz v. Commissioner,551 F.2d 929 (3rd Cir. 1977), and Baird v. Commissioner,438 F.2d 490 (3rd Cir. 1970). In view of the foregoing, we hold for respondent on this issue. (4) Application Of Overpayment In 1971
In August of 1975, petitioner and Hibbs filed with respondent an application for a tentative refund for 1971 of $18,373, which was generated by carrying a net operating loss for 1974 back to 1971. Respondent tentatively allowed the carryback but credited the entire overpayment to Hibbs' outstanding assessment under *533 section 6672 as the responsible officer of Omaha Pork. In the deficiency notice, respondent disallowed the operating loss for 1974 which according to his computation eliminated the loss carryback deduction to 1971 as well as the refund for 1971 which had been tentatively allowed in 1975. Petitioner contends that respondent's application of the overpayment to the separate liability of Hibbs was illegal and inappropriate and that the overpayment should have been refunded as claimed. Petitioner has not briefed this issue and has apparently conceded it. See Stringer v. Commissioner,84 T.C. 693 (1985). In any event, our conclusion with respect to the year of the deduction of the bad debt loss eliminates any net operating loss for 1974 and any loss carryback to 1971. Therefore, the issue is rendered moot. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, unless otherwise indicated. All rule references are to the Tax Court Rules of Practice and Procedure unless otherwise provided.↩
2. On brief respondent has made a belated attempt to argue that the repayment of this note was subsequently forgiven by the bankruptcy of Aaron and may have resulted in income to Hibbs. The contention is untimely and cannot be considered.In any event the record is insufficient to permit a finding on the point.↩
3. On April 4 and April 9, 1974, petitioner and Hibbs also executed two demand notes to First Missouri each in the amount of $25,000. Each of these notes recited that it was secured by a pledge of the $50,000 note and deed of trust which statement is opposite to the stipulation by the parties that the $50,000 note was secured by the other two notes. The record is not clear but apparently the bank took the first note and deed of trust on April 4, 1974 to secure a line of credit of $50,000 and the $25,000 notes were executed by petitioner and Hibbs as the $50,000 was disbursed by the bank on April 4 and April 9, 1974.↩
4. See also Jessup v. Commissioner,T.C. Memo. 1977-289↩.